UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, | Lead Case No.  5:20-cv-00824-EJD |
| Plaintiff, | Consolidated with No. 5:20-cv-00826 EJD |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT; AND DENYING MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF** |
| CITY OF SUNNYVALE, | |
| Defendant. | |
| SAN FRANCISCO BAYKEEPER, | **RE: DKT. NOS. 81, 135** |
| Plaintiff, | |
| v. | |
| CITY OF MOUNTAIN VIEW, | |
| Defendant. | |

Plaintiff San Francisco Baykeeper ("Plaintiff") initiated suits against Defendants City of Sunnyvale ("Sunnyvale") and City of Mountain View ("Mountain View") under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA"), to address the allegedly unlawful discharge of bacteria pollution by these two Cities.  Plaintiff moves for partial summary judgment as to the Second Cause of Action set forth in the First Amended Complaints For Declaratory and Injunctive Relief and Civil

Penalties ("FACs") against each Defendant.  Pl.'s Mot. for Partial Summ. Judg. ("Mot."), Dkt. No. 81.  Specifically, Plaintiff requests a determination of liability for the discharges that occurred on January 17, 2019, February 4, 2019, and February 13, 2019.  Defendants oppose Plaintiff's motion and cross-move for summary judgment.  Defs.' Opp'n to Pl.'s Mot. for Summ. Judg. And Cross-Mot. for Summ. Judg. ("Opp'n"), Dkt. No. 91.  Plaintiff filed a combined reply in support of its motion and opposition to Defendants' cross-motion ("Pl.'s Reply"), Dkt. No. 100, and Defendants filed a reply in support of their cross-motion ("Defs.' Reply"), Dkt. No. 106.[1]  Defendants thereafter filed a motion for leave to file a supplemental brief, Dkt. No. 135, to which Plaintiff objected, Dkt. No. 136, and Defendants replied, Dkt. No. 137.  For the reasons stated below, Defendants' motion for leave to file a supplemental brief will be denied; Plaintiff's motion for partial summary judgment will be granted; and Defendants' cross-motion for summary judgment will be denied.

## I.   BACKGROUND

### A.   The CWA

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve this goal, the CWA prohibits the "discharge of any pollutant" into navigable waters from any "point source" without a permit.  *Id*. § 1311(a).  The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.  *Id*. § 1362(6).  "Discharge of a pollutant" is defined to include "any addition of any pollutant to navigable waters from any point source."  *Id*. § 1362(12)(A).  "[N]avigable waters" means "Waters of the United States" ("WOTUS").  33 U.S.C.

---

[1] The parties' briefs do not comply with the Court's Standing Order for Civil Cases ("Standing Order") in that all of the numerous footnotes, some of which exceed a paragraph in length, are single instead of double-spaced.  *See* Standing Order, ¶ IV.A.4 ("Footnotes shall be . . . double-spaced.").  The parties are advised that the Court will strike any future filings that do not comply with the Standing Order.

§ 1362(7).  A "point source" is any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.  *Id*. § 1362(14).  A municipal separate storm sewer system ("MS4") is a "point source."  40 C.F.R. § 122.26(b)(8).

The CWA requires municipalities like Defendants to acquire a National Pollution Discharge Elimination System ("NPDES") permit for discharges from MS4s.  *See* 33 U.S.C. § 1342(p)(2).  Non-compliance with an NPDES permit constitutes a violation of the CWA.  40 C.F.R. § 122.41.  Good faith, impossibility, ignorance, and de minimus discharges are no defense to a violation.  *See Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1491-92 (9th Cir. 1987), *vacated*, 485 U.S. 931 (1989), *reinstated with minor amendment*, 853 F.2d 667 (9th Cir. 1989) (rejecting "upset defense" and "de minimus" theory); *Kelly v. United States EPA*, 203 F.3d 519, 522 (7th Cir. 2000) ("nothing in the [CWA] makes good faith or a lack of knowledge a defense"); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 412 F.3d 536, 540 (4th Cir. 2005) ("[I]t is plainly possible for those undertaking good-faith remediation . . . nevertheless 'to be in violation' of the Act within the meaning of section 505(a), because the CWA creates a regime of strict liability for violations of its standards.").

### B.  Defendants' MS4 Permit

Congress empowered the Environmental Protection Agency ("EPA") Administrator to delegate NPDES permitting authority to state agencies.  22 U.S.C. § 1342(b).  Pursuant to this authority, the EPA authorized the State of California to develop water quality standards and issue NPDES permits.  *Natural Resources Defense Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1198 (2013).  The San Francisco Bay Regional Water Quality Control Board ("Regional Board") is the state entity charged with issuing the federally-enforceable NPDES permit at issue in this case.  Cal. Wat. Code §§ 13001, 13160, 13200(b), 13225.  Pursuant to that authority, the

1   Regional Board issued the current MS4 Permit to Defendants on November 19, 2015.  *See* Pl.'s

2   Req. for Judicial Notice ("Pl.'s RJN"), Dkt. No. 84-1, Ex. 16 ("MS4 Permit").[2]

3       The MS4 Permit includes a provision entitled "Receiving Water Limitations, B.2."  MS4

4   Permit at 5.  The "Receiving Water Limitations B.2" prohibits discharges from Defendants' MS4s

5   that cause or contribute to the violation of any applicable water quality standards ("WQS") for

6   receiving waters.  *Id*.  WQS are maximum permissible pollutant levels, expressed as numeric

7   limits or in narrative terms, that are sufficiently stringent to protect public health and enhance

8   water quality, consistent with the designated use(s) of the water.  33 U.S.C. § 1313(c)(2)(A).

9       **C.    Defendants' MS4 Discharges**

10      Defendants are municipalities formed under the laws of the State of California.

11  Pl.'s Reply To Defs.' Resp. To Pl.'s Separate Statement Of Undisputed Material Facts ("Reply

12  PSS"), Dkt. No. 100-2, 13-14.  Both are owners and operators of the public MS4 within their

13  jurisdictions.  *Id*.  Every time it rains, Defendants' MS4s collect stormwater from the streets and

14  other surfaces in the Cities and discharge it directly to local creeks.  Reply PSS 17.  Sunnyvale's

15  MS4 discharges directly to Stevens Creek, Calabazas Creek, and the Sunnyvale East Channel.

16  Reply PSS 15.  The stormwater is not treated prior to discharge.  Maharg Decl., Ex. 29 (Dep.

17  Transcript of Michael Vasquez ("Vasquez Tr."), 30:6-12), Ex. 30 (Dep. Tr. of Carrie Sandahl

18  ("Sandahl Tr."), 38:16-42:7).

19      Mountain View's MS4 discharges to Stevens Creek, which subsequently drains to South

20  San Francisco Bay.  Reply PSS 16.  The stormwater that enters Mountain View's MS4 is not

21  treated prior to discharge.  Maharg Decl., Dkt. No. 83, Ex. 29 (Vasquez Tr., 30:6-12), Ex. 30

22  (Sandahl Tr., 38:16-42:7).

23      Stevens Creek, Calabazas Creek, and the Sunnyvale East Channel are "Receiving Waters"

24  within the meaning of the MS4 Permit.  The beneficial uses of Stevens Creek include water

---

[2] The parties' respective requests for judicial notice are granted.

United States District Court
Northern District of California

contact recreation (REC-1) and noncontact water recreation (REC-2), as well as wildlife habitat, cold and warm freshwater habitat, preservation of rare and endangered species, and fish spawning. RJN, Ex. 18 (Basin Plan, Tbl. 2-1).  The beneficial uses of Calabazas Creek similarly include REC-1 and REC-2, as well as wildlife habitat and cold and warm freshwater habitat.  *Id.*  The beneficial uses of Sunnyvale East Channel also include REC-1 and REC-2, as well as wildlife habitat, preservation of rare and endangered species, and estuarine habitat.  *Id.*; Reply RJN, Ex. 40 at 2-8 ("The beneficial uses of any specifically identified water body generally apply to all of its tributaries.").

### D.    Plaintiff Baykeeper

Plaintiff is a California non-profit public benefit corporation with over 3,500 members who live and/or recreate in and around the San Francisco Bay Area.  Reply PSS 1.  Its mission is to protect San Francisco Bay from the biggest threats and hold polluters and government agencies accountable to create healthy communities and help wildlife thrive.  Reply PSS 2.  Baykeeper's members use and enjoy Stevens Creek, Calabazas Creek, Guadalupe Slough, South San Francisco Bay, and the nearby areas and waters.  Reply PSS 4.

From November 2017 to February 2019, Plaintiff's staff scientist, Ian Wren ("Wren"), sampled for bacteria at several of Defendants' MS4 outfalls and within the surface waters into which the outfalls discharge.  Reply PSS 26.  Wren has over twenty years of experience with water quality sampling.  Wren Decl., Dkt. 82,  ¶¶ 5-10.  According to Plaintiff, the sampling demonstrates that Defendants' stormwater discharges are contributing to exceedances of bacteria WQS, in violation of Receiving Water Limitation B.2.  Reply PSS 29-122.

## II.    STANDARDS

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  The moving party bears the initial burden of informing the court of the basis for the motion and

United States District Court
Northern District of California

1    identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or

2    affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*,

3    477 U.S. 317, 323 (1986). If the issue is one on which the nonmoving party must bear the burden

4    of proof at trial, the moving party need only point out an absence of evidence supporting the

5    claim; it does not need to disprove its opponent's claim. *Id*. at 325.

6         If the moving party meets the initial burden, the burden then shifts to the non-moving party

7    to go beyond the pleadings and designate specific materials in the record to show that there is a

8    genuinely disputed fact. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 324. A "genuine issue"

9    for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing

10   the evidence in the light most favorable to that party, could resolve the material issue in his or her

11   favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

12        The court must draw all reasonable inferences in favor of the party against whom summary

13   judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

14   However, the mere suggestion that facts are in controversy, as well as conclusory or speculative

15   testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. *Id*.

16   ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than

17   simply show that there is some metaphysical doubt as to the material facts."); *Thornhill Publ'g*

18   *Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come

19   forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c).

20        "If the nonmoving party fails to produce enough evidence to create a genuine issue of

21   material fact, the moving party wins the motion for summary judgment." *Nissan Fire & Marine*

22   *Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). "But if the nonmoving party

23   produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats

24   the motion." *Id*.

25        Where, as here, the parties have filed cross-motions for summary judgment, "[e]ach

26   motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v.*

27

28   CASE NO.: 5:20-CV-00824-EJD
     ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

United States District Court
Northern District of California

*Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion."  *Id*.  "[T]he filing of cross-motions for summary judgment, both parties asserting that there are no uncontested issues of material fact, does not vitiate the court's responsibility to determine whether disputed issues of material fact are present.  A summary judgment cannot be granted if a genuine issue as to any material fact exists."  *Id*. (quoting *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir.1978)).

## III.   DISCUSSION

Plaintiff seeks partial summary judgment that (i) it has standing to bring the claims, (ii) Defendants are subject to the MS4 Permit, and (iii) Defendants are liable for violating Receiving Water Limitation B.2 on the days in Water Year 2019 in which it sampled Defendants' outfalls, that is, January 17, 2019, February 4, 2019, and February 13, 2019.  Defendants oppose Plaintiff's motion and concurrently move for summary judgment, asserting that Plaintiff lacks standing.  More specifically, Defendants contend that Plaintiff's members have not been injured in fact by any alleged exceedance of bacteria WQS in the water bodies at issue; that Plaintiff's potential injury cannot be traced to Defendants; and that the alleged violations cannot be redressed in a meaningful or complete way given the natural occurrence and broad watershed basis of bacteria in urban streams.  Further, Defendants raise issues regarding the applicability, quantity, relevance, and reliability of Plaintiff's sampling data.  Among other things, Defendants fault Plaintiff for analyzing samples using different bacteria constituents than those prescribed in the Basin Plan; failing to take the required quantity of samples, evenly spaced over the required time frame; and failing to take sampling in accordance with Plaintiff's own quality assurance plans.

### A.   Defendants' Motion for Leave to File Supplemental Brief

As a preliminary matter, Defendants request leave to file a supplemental brief to advise the Court of Regional Board's recent revisions to the Permit at issue in the case.  Dkt. No. 135.  The request is denied.  Civil Local Rule 7-3(d) provides that once a reply is filed, no additional

CASE NO.: 5:20-CV-00824-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

United States District Court
Northern District of California

memoranda, papers, or letters may be filed, with two exceptions that do not apply here.  Civ. Local Rule 7-3(d).  The denial, however, is without prejudice to file a motion for reconsideration under Civil Local Rule 7-9, if Defendants are able to satisfy the requirements for doing so.

### B.   Standing

Federal courts are courts of limited jurisdiction; they are authorized only to exercise jurisdiction pursuant to Article III of the U.S. Constitution and federal laws enacted thereunder. *Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F. Supp. 2d 888, 896 (N.D. Cal. 2011); *see also Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.").  Hence, an Article III federal court must ask whether a plaintiff has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III of the U.S. Constitution.  *In re LinkedIn User Priv. Litig.*, 932 F. Supp. 2d 1089, 1092 (N.D. Cal. 2013).  To satisfy Article III standing, a plaintiff must allege: (1) an injury-in-fact that is concrete and particularized, as well as actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely (not merely speculative) that injury will be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.* ("*Laidlaw*"), 528 U.S. 167, 180–81 (2000); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).  If a plaintiff cannot allege Article III standing, then the federal court lacks jurisdiction over the case and must dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(1). *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 687 (9th Cir. 2003); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 109-10 (1998).

#### 1.   Injury in Fact

Organizational standing, or associational standing, allows a group to sue on its members' behalf, without showing an injury to the organization itself.  *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552 (1996) ("*United Food*").  To avail itself

United States District Court
Northern District of California

of associational standing, an organization must conclusively demonstrate that: (1) at least one of its members would have standing to sue independently; (2) the interests pursued in the case are germane to the organization's purpose; and (3) neither the claims raised nor the relief sought require individual members to participate.  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171–72 (9th Cir. 2002). As to the first prong, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, (1972)).  *See also Lujan*, 504 U.S., at 562–563, 112 S.Ct. 2130 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing."); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) ("an individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded").

Here, Plaintiff identifies three members—Elsbeth TeBrake ("TeBrake"), Gary Leong ("Leong") and Mark Reedy ("Reedy")—who allege they have suffered an injury in fact.  Decl. of Elsbeth TeBrake in Supp. of Pl.'s Mot. for Partial Summ. Judg. Under FRCP 56 ("TeBrake Decl.), Dkt. No. 81-5;  Decl. of Gary Leong in Supp. of Pl.'s Mot. for Partial Summ. Judg. Under FRCP 56 ("Leong Decl."), Dkt. No. 81-4; Decl. of Mark Reedy in Supp. of Pl.'s Mot. for Partial Summ. Judg. Under FRCP 56 ("Reedy Decl."), Dkt. No. 81-3.  Each of the three members has recreated in or near at least one Receiving Water.  TeBrake enjoys biking along Stevens Creek, walking along Calabazas Creek, and sailing on San Francisco Bay.  TeBrake Decl. ¶¶ 9-13.  TeBrake attests that she is aware Defendants discharge stormwater with high levels of bacteria pollution in Stevens Creek and other local waters that lead to San Francisco Bay; that on her many regular

United States District Court
Northern District of California

visits to Stevens Creek Trail, she has noticed the odor of raw sewage and discoloration of water from what she believes to be bacteria; that she is fearful of bacterial contamination and the adverse health risks from exposure to raw sewage, which prevents her from fully enjoying the aesthetic and recreational activities along Stevens Creek and South San Francisco Bay; and that she would like to stop on her bike rides with her children and interact with the water and nature along Stevens Creek, but does not do so because she does not want to risk being exposed to raw sewage and other pollutants. *Id.*, ¶¶14-17. Tebrake plans to continue to recreate along Stevens Creek, Calabazas Creek, and South San Francisco Bay in the near future. TeBrake Decl., ¶20. [3]

Leong attests that he regularly engages in stand-up paddle boarding in South San Francisco Bay; that before the pandemic, he rode his bicycle, jogged, or walked along Stevens Creek; that he is aware Defendants discharge stormwater that has high levels of fecal contamination into Stevens Creek and other local waters that lead to San Francisco Bay; and that he stays out of the water after the first major rain event of each wet season and subsequent rain seasons, depending on the frequency of the rain that season, to avoid exposure to stormwater laced with fecal contamination and other pollutants. Leong Decl., ¶¶ 9-13. Leong plans to continue these recreational activities in the future. *Id.*, ¶16. [4]

Reedy attests that he regularly rides his bicycle on Stevens Creek trail to the Bay; that he is aware Defendants discharge stormwater with high levels of bacteria pollution into Stevens Creek and other local waters that lead to San Francisco Bay; and that his aesthetic and recreational enjoyment is decreased by the sight of and knowledge of unhealthy and polluted waters. Reedy Decl., ¶¶ 9-12. Reedy plans to continue these recreational activities in the near future. *Id.*, ¶14.[5]

---

[3] It is unclear whether TeBrake recreates near Guadalupe Slough. Maharg Reply Decl., Ex. 56 (TeBrake Tr., 26:11-20).

[4] Leong has not been to Calabazas Creek. Nor has he recreated in or near Guadalupe Slough. He initially testified that he had recreated in Guadalupe Slough (Maharg Reply Decl., Dkt. No. 102, Ex. 57 (Leong Tr., 13:23-14:3; 14:21-25, 19:5-8), but clarified he was mistaken (Ex. U, Dkt. No. 93-9, Leong DT at 38:10-23).

[5] There is no evidence that Reedy recreated in or near Guadalupe Slough.

1    Thus, Plaintiff's three members have demonstrated that Defendants' discharges detract

2    from their use and enjoyment of Stevens Creek, Calabazas Creek, and/or South San Francisco

3    Bay.  They also confirm that remediating the pollution will increase their aesthetic and

4    recreational enjoyment of these waters.  TeBrake Decl., ¶ 19 (remediating the pollution "would

5    increase my aesthetic and recreational enjoyment of the waterways"); Leong Decl., ¶ 15

6    (remediating the pollution "would add to my enjoyment and I would use the waters more"); Reedy

7    Decl., ¶ 13 (if the pollution was remedied, "I would be more attracted to and use the creek more").

8    In the context of a pollution discharge case, the Ninth Circuit has found comparable evidence

9    sufficient to establish Article III standing.  *Inland Empire Waterkeeper v. Corona Clay Co.*, 17

10   F.4th 825, 832 (9th Cir. 2021) (finding "sworn testimony from [organizational] members that they

11   lived near the Creek, used it for recreation, and that pollution from the discharged storm water

12   impacted their present and anticipated enjoyment of the waterway," were sufficient to establish

13   Article III standing to pursue unlawful discharge claim).

14   Defendants raise several challenges to the members' standing.  Defendants contend that the

15   members lack standing because they have not connected their aesthetic and recreational injuries to

16   a REC-2 standard violation.  Plaintiff, however, asserts violations of both REC-1 and REC-2

17   standards.  Indeed, Plaintiff's motion focuses on violations of the REC-1 standards.  *See* Pl.'s

18   Motion at 11-23, 34-35.

19   Defendants next contend that the three members have not suffered an injury to their

20   aesthetic and recreational interests because they cannot see or smell bacteria levels above

21   applicable water quality standards.  The Court rejects this argument because it is inconsistent with

22   *Laidlaw*.  In *Laidlaw*, organizational plaintiffs brought suit, alleging that the defendant's

23   discharges into the North Tyger River exceeded allowable levels of mercury under its NPDES

24   permit.  *Laidlaw*, 528 U.S. at 176-77.  Several organizational members attested to the impact of

25   the pollution on their use and enjoyment of waters, without ever indicating whether or not they

26   had seen or smelled the mercury pollution.  *Id*. at 183.  Only one of the members attested that he

United States District Court
Northern District of California

1    occasionally drove over the North Tyger River, and observed that it looked and smelled polluted.

2    *Id*. at 181-82.  The rest attested to recreating in and around the River because of the natural beauty

3    of the area, and to discontinuing their activities because of concerns about harmful effects from

4    discharged pollutants.  *Id*. at 182.  The Supreme Court held that their attestations were sufficient to

5    establish an injury in fact.  *Id.* at 183.

6         Defendants' reliance on *Natural Resources Defense Council v. U.S. Environmental*

7    *Protection Agency*, 542 F.3d 1235 (9th Cir. 2008) ("*NRDC*"), is unavailing.  In *NRDC*, several

8    organizational members submitted declarations averring that for years, they had used particular

9    waterways for aesthetic and recreational purposes, and that their use and enjoyment of those

10   waterways had been diminished due to storm water discharge from construction sites.  *Id.*  at 1245.

11   Although the *NRDC* court noted that "many" members (not all) described having observed storm

12   water discharge flowing directly from construction sites into the waterways the members use, the

13   *NRDC* court did not imply that members must have viewed pollution entering or present in the

14   watercourses in order to establish an injury in fact.  Rather, citing *Laidlaw*, the *NRDC* court

15   concluded that "the members' statements that their use of specific waterways has been diminished

16   due to their concerns about discharge from a particular source (here, the construction sites) are

17   sufficient to establish injury in fact."  *Id*. at 1245.  Like the members in *NRDC*, the members in

18   this case attest to the use of the waters at issue for aesthetic and recreational purposes and to their

19   diminished use and enjoyment due to Defendants' discharges of stormwater with high levels of

20   bacteria pollution.

21        Defendants also rely on *Californians for Alternatives to Toxics v. Schneider Dock &*

22   *Intermodal Facility, Inc.*, 374 F. Supp. 3d 897 (N.D. Cal. 2019) ("*Alternatives to Toxics*"), where

23   one organizational member attested to encountering two large, foul-smelling plumes while

24   kayaking past the defendant's log-handling facility after a large storm.  *Id*. at 908.  The other

25   organizational member, a retired biologist, however, did not attest to observing any pollution

26   emissions.  *Id*. at 908.  Instead, the biologist declared that pollution of the Humboldt Bay, to which

27

28   CASE NO.: 5:20-CV-00824-EJD
     ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

United States District Court
Northern District of California

the defendant's facility's runoff contributed, caused him aesthetic and recreational injury by impairing the ecosystem and harming various species that he takes pleasure in observing. *Id*. The biologist also declared that he discontinued fishing in the Bay due to pollution concerns. *Id*. The *Alternatives to Toxics* court concluded that the declarations of both members established the requisite injury in fact: the members derived recreational and aesthetic benefit from their use of the Bay, but their use had been curtailed because of their concerns about pollution, contaminated fish, and the like. *Id*. at 909. Like the members in *Alternatives to Toxics*, the members in this case attest that they have derived recreational and aesthetic benefits from the waters at issue, and that their use has been curtailed due to concerns about pollution.

Defendants next contend that Plaintiff's members lack standing because they have not changed and have no intention of changing their use of Stevens Creek or South San Francisco Bay based on the bacteria levels in the Receiving Waters. This argument is factually and legally unpersuasive. Factually, two members attest to avoiding portions of the Receiving Waters. TeBrake Decl., ¶¶ 14-17; Leong Decl., ¶¶ 13-14. Legally, contrary to Defendants' assertion, Plaintiff's members are not required to avoid using the Waters in order to establish standing. Instead, "in environmental cases, plaintiffs generally satisfy the injury-in-fact requirement by alleging that they are less able to use [the area] affected by a defendant's conduct." *See*, *e.g.*, *Gingery v. City of Glendale*, 831 F.3d 1222, 1227 (9th Cir. 2016) (citing *Laidlaw*, 528 U.S. at 182–83, and *NRDC*, 542 F.3d at 1245). Here, each of Plaintiff's members attest that they are less able to use the water bodies at issue. TeBrake attests that she would like to interact with the water and nature along Stevens Creek, but does not do so because she does not want to risk being exposed to raw sewage and other pollutants. TeBrake Decl., ¶ 17. Leong attests that he has enjoyed recreational activities in San Francisco Bay and the local waterways, but stays out of them after it rains to avoid exposure to stormwater laced with fecal contamination and other pollutants. Leong Decl., ¶¶ 11-13. Reedy attests that his aesthetic and recreational enjoyment is decreased by the sight of and knowledge of unhealthy and polluted waters. Reedy Decl., ¶ 11. He would be

1    more attracted to and use Stevens Creek more if actions were taken to remedy the bacteria

2    pollution so that the water was safer.  *Id.* ¶ 13.  "Repeated recreational use itself, accompanied by

3    a credible allegation of desired future use, can be sufficient . . . to demonstrate that environmental

4    degradation of the area is injurious to that person."  *Ecological Rights Found.*, 230 F.3d at 1149.

5    In sum, under well-settled precedent, the members' attestations are sufficient to show Plaintiff's

6    members suffered an injury in fact.  *See, e.g., Laidlaw*, 528 U.S. at 182–83 (holding that plaintiffs

7    who "would use" allegedly polluted areas located several miles from their homes, but "refrained"

8    from doing so, had established injury in fact); *NRDC*, 542 F.3d at 1245 (injury in fact established

9    where plaintiffs alleged that their "use and enjoyment" of certain waterways "has been

10   diminished" due to pollution); *see also San Francisco Baykeeper v. West Bay Sanitary District*,

11   791 F. Supp. 2d 719, 745 (N.D. Cal. 2011) (Baykeeper members whose aesthetic and recreational

12   values of the area, *i.e.* sailing, boating, windsurfing, kayaking, walking and biking along water's

13   edge, observing wildlife and ecosystem, and fishing, would be lessened by defendants' discharges

14   had standing to bring CWA citizen suit);  *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874

15   F.3d 1083, 1094 (9th Cir. 2017) ("By attesting to their reduced ability to enjoy eating local

16   seafood . . ., observing birds and other wildlife from the air or from the wetlands . . . , or sailing

17   and swimming safely in San Francisco Bay, among other harms, EcoRights members have alleged

18   concrete and particularized injuries from the alleged migration of PCP and dioxins from PG&E's

19   Hayward facility to the affected area, San Francisco Bay.").

20            **2.    Traceability**

21            To establish standing, the injury in fact must be fairly traceable to the challenged action of

22   the Defendants.  *Laidlaw*, 528 U.S. at 180–81.  "[The causal connection put forward for standing

23   purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but

24   need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would

25   succeed on the merits."  *Ecological Rights Found.*, 230 F.3d at 1152.

26            Defendants contend that Plaintiff cannot establish traceability because water quality data

27

28   CASE NO.: 5:20-CV-00824-EJD
     ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

United States District Court
Northern District of California

from upstream of the Defendants' stormwater discharge locations shows bacteria levels "that would appear to exceed water quality objectives," and therefore, even if Defendants ceased all stormwater discharges, the water bodies would still exceed bacteria objectives.  Opp'n at 11.  This combined traceability and redressability argument is unpersuasive because "a plaintiff must merely show that a defendant discharges a pollutant that causes *or contributes* to the kinds of injuries alleged in the specific geographic area of concern.'"  *Nat. Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985, 995 (9th Cir. 2000) (emphasis added) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (en banc)); *West Bay Sanitary District*, 791 F. Supp. 2d at 749 (same).  Plaintiff's sampling satisfies this showing, as discussed in subsection "C" below.  Plaintiff has presented evidence that Defendants' discharge of stormwater includes *E.coli*, Enterococci, and fecal coliform; that those contaminants are present in downstream waters; and that Defendants contributed to Plaintiff's members' injuries.  The traceability requirement does not mean Plaintiff must show to a scientific certainty that Defendants caused the alleged harm.  *Sw. Marine*, 236 F.3d at 995 (citing *Friends of the Earth, Inc.*, 204 F.3d at 161.  Whether Plaintiff's claim is redressable is discussed below.

### 3.    Redressability

Redressability of a plaintiff's injury is the third and final component of Article III standing. To establish Article III redressability, a plaintiff must show that the relief sought is both (1) substantially likely to redress the claimed injuries; and (2) within the district court's power to award.  *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020).

Defendants contend that Plaintiff cannot satisfy the redressability component of standing. Relying on *Juliana*, Defendants assert that an injunction requiring them to take specific actions will not be enough to control bacteria levels in the water bodies at issue because there are other sources of bacteria over which they have no control.  Other sources of bacteria may include for example, other cities' discharges, wildlife defecation, and homeless encampments.  The facts of *Juliana*, however, are readily distinguishable. The *Juliana* plaintiffs sought broad remedies that

United States District Court
Northern District of California

exceeded the scope of their lawsuit.  In *Juliana*, the plaintiffs claimed that the government was violating their constitutional rights, including a claimed right under the Due Process Clause of the Fifth Amendment to a "climate system capable of sustaining human life."  *Id*. at 1164.  The *Juliana* court concluded that the plaintiffs could not satisfy the redressability requirement for multiple reasons.  First, the plaintiffs' requested declaration finding that the government was violating the Constitution was unlikely by itself to remediate their injuries.  *Id*. at 1170.  Second, the plaintiffs' requested injunction to require the government to cease permitting, authorizing, and subsidizing fossil fuel use, and to prepare a plan subject to judicial approval to draw down harmful emissions, was tantamount to a request to enjoin the Executive from exercising discretionary authority expressly granted by Congress, and to enjoin Congress from exercising power granted by the Constitution over public lands.  *Id*.  Further, the plaintiffs' own expert opined that reducing the global consequences of climate change demanded much more than cessation of the government's promotion of fossil fuels.  *Id*. at 1170-71.

Unlike in *Juliana*, Plaintiff in this case is not asserting a broad right to a climate system capable of sustaining life.  Nor will Plaintiff's requested relief interfere with the Executive or Legislative branches of the federal government.  Rather, Plaintiff has brought a focused CWA claim over specific discharges from Defendants' MS4s.  The CWA authorizes a federal court to issue an injunction to remediate a harm as alleged, thereby satisfying the redressability requirement.  *Corona Clay*, 17 F.4th at 832 (citing *Sw. Marine*, 236 F.3d at 995).  In accordance with the CWA, Plaintiff seeks to enjoin Defendants from violating the MS4 Permit and Sections 301(a) and 402 of the CWA, and thereby reduce bacteria levels.  This proposed remedy is tailored to redress the members' alleged harms, as required by *Gill v. Whitford*, 138 S.Ct. 1916, 1934 (2018), and unlike in *Juliana*, Plaintiff does not concede that the requested relief will be ineffective.  Defendants assert that it is not feasible to attain WQS in all MS4 discharges for a variety of reasons, including other sources of bacteria over which they have no control, technical challenges, economic constraints, and the potential that diverting stormwater may cause other

United States District Court
Northern District of California

adverse environmental impacts.  But at present, the WQS remain in effect, and for purposes of

standing, Plaintiff is not required to prove that redress is guaranteed.  *Juliana*, 947 F.3d at 1170

("Redress need not be guaranteed, but it must be more than "merely speculative.") (quoting *Lujan*,

504 U.S. at 561)).

Defendants next assert that they drafted a proposed remedial plan, which has been

approved by the Regional Water Board and is in the process of being implemented, and that it is

inappropriate for Plaintiff to dictate a different or faster plan by pursuing injunctive relief in this

lawsuit.  Sunnyvale made essentially the same argument in its earlier filed motion to dismiss,

invoking the doctrine of primary jurisdiction, which the Court rejected.  The argument fares no

better repackaged as a redressability issue.  "The Clean Water Act explicitly allows private

citizens to bring enforcement actions against any person alleged to be in violation of federal

pollution control requirements."  *See Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor

Res., Inc.*, 299 F.3d 1007, 1012 (9th Cir. 2012) (citing 33 U.S.C. § 1365(a)(1)) (citations omitted).

"The citizen suit provision in the Clean Water Act was specifically designed to allow courts to

ensure direct compliance with the Act's requirements."  *Nat. Res. Def. Council v. McCarthy*, 2017

WL 3215346, at *3 (N.D. Cal. July 26, 2017) (quoting *Hawai'i Wildlife Fund v. Cty. of Maui*, 24

F. Supp. 3d 980, 990 (D. Haw. 2014)).  Whether and to what extent Defendants take remedial

measures does not necessarily preclude Plaintiff from bringing this suit.

In sum, the Court concludes that at least one of Plaintiff's members would have standing to

sue independently.  Defendants' motion for summary judgment based on lack of standing is

therefore denied.  Defendants are correct, however, that the three members have not recreated in or

near Guadalupe Slough, and therefore do not have standing to assert claim(s) based on violations

of WQS in Guadalupe Slough.

## C.     WOTUS

The CWA applies to WOTUS.  *Rapanos v. U.S.*, 547 U.S. 715, 724 (2006) (citing 42 Fed.

Reg. 37144, n.2 (1977).  The CWA does not define WOTUS, and consequently it has presented a

United States District Court
Northern District of California

murky issue for courts.  *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. --, -- n.4, 140 S.Ct. 1462, 1484 n.4, 206 L.Ed.2d 640 (2020) (Alito, J., dissenting) (noting that the term "waters of the United States" is not defined by the CWA and "has presented a difficult issue for this Court," citing *Rapanos*).  Prior to 2015, the regulations defined WOTUS in pertinent part as (1) "All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (2) All interstate waters including interstate wetlands; (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams)" and tributaries of waters identified of traditionally navigable waters and waters which are subject to the ebb and flow of the tide.  *U.S. v. Moses*, 496 F.3d 984, 988 (9th Cir. 2007).

In 2015, the U.S. Army Corps of Engineers ("Corps") and EPA promulgated a "final rule" defining WOTUS, which became effective on August 28, 2015.  Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule").  The 2015 Rule defines WOTUS to include traditional navigable waters, interstate waters, territorial seas, and impoundments of jurisdictional waters.  *Id*. at 37,058.  The 2015 Rule includes a significant-nexus requirement.  *Id*.  Under the 2015 Rule significant-nexus standard, waters are WOTUS if they, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas.  *Id*.

In 2019, the Corps and EPA issued another ruling which rescinded the 2015 Rule and restored the regulatory definition of WOTUS that existed prior to the 2015 Rule.  Definition of "Waters of the United States" – Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (October 22, 2019) ("2019 Rule").  The 2019 Rule became effective on December 23, 2019 (*id*.), which is after the alleged violations that are the subject of the present motions.   Under the 2019 Rule, WOTUS are waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow

United States District Court
Northern District of California

1    of the tide.  *Id*.

2         The Corps and EPA approved another regulation again redefining WOTUS, which became

3    effective on June 22, 2020.  The Navigable Waters Protection Rule: Definition of "Waters of the

4    United States," 85 Fed. Reg. 22,250 (April 21, 2020) ("2020 Rule").  Under the 2020 Rule,

5    WOTUS is defined to encompass the territorial seas and traditional navigable waters; perennial

6    and intermittent tributaries that contribute surface water flow to such waters; certain lakes, ponds,

7    and impoundments of jurisdictional waters; and wetlands adjacent to other jurisdictional waters.

8    *Id*.  A district court, however, has recently vacated and remanded the 2020 Rule to the Corps and

9    EPA.  *Pascua Yaqui Tribe v. U.S. Envtl. Prot. Agency*, No. 20-266 TUC, 2021 WL 3855977, at *6

10   (D. Ariz. Aug. 30, 2021); *see also California v. Regan*, No. 20-3005 RS, 2021 WL 4221583, at *1

11   (N.D. Cal. Sept. 16, 2021) (stating that the issue of whether vacatur is warranted appeared to be

12   moot because of *Pascua Yaqui Tribe*, and granting motion to remand to agencies).

13        In its opening brief, Plaintiff asserts that the 2015 Rule applies for purposes of determining

14   whether a violation occurred during January and February 2019, and that the 2019 Rule (which

15   restores the pre-2105 definition) applies for purposes of determining whether there are ongoing

16   violations.  Pl.'s Mot. at 28.  In its reply brief, however, Plaintiff takes the position that the pre-

17   2015 definition applies.  Pl.'s Reply at 12-13.

18        Defendants do not commit to any position on which Rule applies, observing only that

19   "[t]he state of the law related to WOTUS jurisdictional determinations is so murky that the United

20   States Supreme Court had a difficult time determining where the line between WOTUS and non-

21   WOTUS sat even before the rules were changed in 2015 and 2020."  Defs.' Opp'n at 15.  Yet,

22   Defendants insist, without any legal support, that genuine issues of fact preclude summary

23   judgment.

24        The Court concurs with Plaintiff's position that the 2015 Rule applies for purposes of

25   determining whether a violation occurred during January and February of 2019 because that Rule

26   was in effect at that time.  The Court also concurs that the 2019 Rule restoring the pre-2015

27
28   ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

United States District Court
Northern District of California

standard applies for purposes of determining whether there is an ongoing violation because that Rule was in effect when Plaintiff's filed their complaints and remains in effect.  Each water body is addressed below.

### 1.   San Francisco Bay and Guadalupe Slough

It is undisputed that South San Francisco Bay is a traditionally navigable water that is tidally influenced, and therefore a WOTUS.  Reply PSS 18.  Defendants also concede that Guadalupe Slough is tidally influenced and is "most likely" properly characterized as a WOTUS.

The Court finds that San Francisco Bay and Guadalupe Slough are WOTUS.

### 2.   Stevens Creek and Calabazas Creek

Stevens Creek and Calabazas Creek were artificially extended to South San Francisco Bay, and have tidally influenced portions closest to the Bay.  Reply PSS 20-21 and Defs.' Response thereto.  A section of Stevens Creek has water flowing year-round, while another section has only seasonal intermittent water flowing.  Reply PSS 20.  Calabazas Creek also has a portion with intermittent seasonal flow.  Reply PSS 21.

Defendants contend that there are genuine issues regarding whether Stevens Creek is a WOTUS because it was artificially attached to San Francisco Bay; the flow from Stevens Creek reservoir to Stevens Creek often goes subsurface; and sections of Stevens Creek dry up in the summer and do not resume flowing until rainy season.  Defendants contend that similar issues exist for Calabazas Creek.

While perhaps historically accurate, the arguments fail to persuade.  Stevens and Calabazas Creeks are tributaries of a WOTUS, and therefore WOTUS.  *See Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533-34 (9th Cir. 2001) (applying pre-2015 standard); 80 Fed. Reg. at 37,057 ("Tributary streams, including perennial, intermittent, and ephemeral streams, are chemically, physically, and biologically connected to downstream waters, and influence the integrity of downstream waters.").  Artificial waters can be WOTUS.  *See Headwaters*, 243 F.3d at 533-34 (irrigation canals that exchange water with WOTUS are also WOTUS); *Moses*, 496 F.3d

United States District Court
Northern District of California

1    at 989 ("we do not see how a mere man-made diversion, however long ago undertaken, could

2    change Teton Creek from a [WOTUS] into something else."); *United States v. Acquest Transit*

3    *LLC*, No. 09-55S, 2021 WL 809984, at * (W.D. N.Y. Mar. 3, 2021) (As of 2007, man-made

4    ditches connecting to WOTUS are included in the definition of WOTUS); *United States ex rel.*

5    *Cal. Dept. of Fish & Wildlife v. HVI Cat Canyon, Inc.*, 314 F. Supp. 3d 1049, 1062, n.16. (C.D.

6    Cal. 2018) ("even a manmade waterway may be jurisdictional under the CWA"); 80 Fed. Reg.

7    37,100 (under 2015 Rule, "the agencies view some waters, such as channelized or piped streams,

8    as jurisdictional currently even when used as part of a stormwater management system. Nothing in

9    the proposed rule was intended to change that practice.").

10    　　　　Waters with intermittent flow can also be WOTUS.  *Headwaters*, 243 F.3d at 533 (pre-

11    2015 Rule, defining tributary as "stream which contributes its flow to a larger stream or other

12    body of water); 80 Fed. Reg. at 37,057 (2015 Rule defining perennial, intermittent, or ephemeral

13    streams as tributaries); *Moses*, 496 F.3d at 990 ("seasonally intermittent stream which ultimately

14    empties into a river that is a [WOTUS] can, itself, be a [WOTUS]."); *see also United States v.*

15    *Viestra*, 492 Fed. Appx. 738, 740 (9th Cir. 2012) (upholding jury verdict finding canal that flows

16    into navigable water six to eight months per year was WOTUS); *HVI Cat Canyon*, 314 F. Supp. at

17    1060-61 (applying *Rapanos* and finding creeks that flowed 18 to 117 days per year, 34 days per

18    year, and 20 days per year were WOTUS).  These cases support the finding that Stevens Creek

19    and Calabazas Creek are WOTUS.

20    　　　　　　　**3.    Sunnyvale East Channel**

21    　　　　Sunnyvale East Channel is a manmade water that conveys stormwater runoff, irrigation

22    water runoff, and groundwater to Guadalupe Slough and the Bay.  Wren Decl., ¶24.

23    　　　　Defendants contend that a material issue exists as to whether Sunnyvale East Channel is

24    WOTUS because (1) Baykeeper's own expert was unsure about whether it was WOTUS or a point

25    source, and (2) the 2013 "Preliminary Delineation of Wetlands and Other Waters" is unreliable

26    and does not conclusively state that the entire 6.5 mile long Channel is tidally influenced.

27

28    ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

United States District Court
Northern District of California

1        On review, the Court finds that the Sunnyvale East Channel is a WOTUS under the pre-

2   2015 standard.  Sunnyvale East Channel discharges into Guadalupe Sough, which is tidally-

3   influenced, and therefore is a WOTUS.  *Headwaters*, 243 F.3d at 533 (applying 40 C.F.R. §

4   122.2(c) and (e) and concluding that irrigation canals exchanging water with natural streams and

5   at least one lake is a tributary, and therefore WOTUS).  That Sunnyvale East Channel is manmade

6   does not affect the analysis; manmade tributaries fall within the definition of WOTUS.  *See id*.,

7   243 F.3d at 533-34 (manmade irrigation ditches are WOTUS); *United States v. Adam Bros.*

8   *Farming*, 369 F. Supp. 2d 1166, 1176-77 (C.D. Cal. 2003) (finding that creek flowing only as a

9   result of being pumped is a tributary subject to CWA jurisdiction).  Sunnyvale East Channel also

10  satisfies the pre-2015 "significant nexus" test set forth in *Rapanos* because it discharges to

11  Guadalupe Slough, a downstream WOTUS.  *See N. Cal. River Watch v. City of Healdsburg*, 496

12  F.3d 993, 1000 (9th Cir. 2007) (adopting Justice Kennedy's significant nexus test from *Rapanos*).

13  The 2013 Santa Clara Valley Water Conservation District's "Preliminary Delineation of Wetlands

14  and Other Waters" also lends support to the conclusion that Sunnyvale East Channel is a WOTUS.

15  RJN, Ex. 19 (Appendix O) (preliminarily determining that the tidally influenced area at the north

16  mouth of the Channel is WOTUS).

17      Sunnyvale East Channel is also a WOTUS under the 2015 Rule because it is a "tributary."

18  80 Fed. Reg. at 37,114 (defining tributary as water that "contributes flow" to a jurisdictional water

19  and that is "characterized by the presence of physical indicators of flow—bed and banks and an

20  ordinary high water mark" and including natural, man-altered, or man-made water); Reply PSS

21  22; RJN, Ex. 19 at P-SVMV6446, 6453.  Further, as discussed previously, a WOTUS can be man-

22  made.  80 Fed. Reg. at 37,100 ("the agencies view some waters, such as channelized or piped

23  streams, as jurisdictional currently even when used as part of a stormwater management system).

24      Plaintiff argues in the alternative that if Sunnyvale East Channel is not a WOTUS, it is

25  nevertheless subject to regulation as a point source that conveys and discharges stormwater to a

26  WOTUS, namely Guadalupe Slough.  Defendants concede that Sunnyvale East Channel is a point

27

28

United States District Court
Northern District of California

1  source,[6] but appear to suggest that Plaintiff cannot obtain relief without joining Santa Clara Valley

2  Water District ("Valley Water"), the owner and operator of the Channel, as a party.  This

3  argument is untimely.  "In federal procedure, failure to join necessary parties is waived if

4  objection is not made in defendant's first responsive pleading."  *Citibank, N.A. v. Oxford*

5  *Properties & Finance*, 688 F.2d 1259, 1263, n.4 (9th Cir. 19820.  Regardless, the Court finds that

6  Valley Water is not a necessary party within the meaning of Federal Rule of Civil Procedure 19

7  because its presence is not necessary for the Court to grant Plaintiff's injunction prohibiting

8  Defendants from violating the MS4 Permit.  Valley Water has no control over the quality of

9  Sunnyvale's municipal stormwater discharges.

**D.**     **Discharge Prohibition B.2 And Sampling Results**

11         The "Receiving Water Limitations B.2" prohibits discharges from Defendants' MS4s that

12  cause or contribute to the violation of any applicable WQS for receiving waters.  *Id.*  There are

13  two potentially applicable WQS:  (1) San Francisco Bay Basin (Region 2) Water Quality Control

14  Plan ("Basin Plan"), RJN, Ex. 9 (Tbl. 3-1); and (2) the State Water Resources Control Board's

15  Bacteria Provisions and a Water Quality Standards Variance Policy, dated February 4, 2019, and

16  approved March 22, 2019 ("State Bacteria Standards"), RJN, Ex. 11.

17         The Basin Plan Water Quality Objectives for Bacteria are stated below.

**Basin Plan, Excerpt of Table 3-1 Water Quality Objectives for Bacteria**
(Based on a minimum of five consecutive samples equally spaced over a 30-day period)

| Beneficial use | Fecal Coliform (MPN/100 ml) | Total Coliform (MPN/100 ml) | Enterococcus (MPN/100 ml)[7] |
|---|---|---|---|
| Water Contact Recreation [REC-1] | geometric mean < 200 90th percentile < 400 | median < 240 no sample > 10,000 | geometric mean < 35 no sample > 104 |
| Non-contact Water Recreation [REC-2] | mean < 2000 90th percentile < 4000 | | |

---

[6] Defs.' Opp'n at 23 (acknowledging that Sunnyvale East Channel is "most likely" a point source).

[7] This standard is applicable to marine and estuarine waters only.

CASE NO.: 5:20-CV-00824-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .
23

United States District Court
Northern District of California

1    Pl.'s RJN, Dkt. No. 84-1, Ex. 9 (Tbl. 3-1).[8]

2         The State Bacteria Standards are set forth below.

| State Bacteria Provisions, Table 1. REC-1 Bacteria Water Quality Objectives | | | |
| --- | --- | --- | --- |
| Applicable Waters | Indicator | Geometric Mean (GM) (cfu/100 ml) | Statistical Threshold Value (STV) (cfu/100 ml) |
| All waters where the salinity is equal to or less than 1 ppth 95 percent or more of the time (i.e., freshwater) | E. coli | 100 | 320 |
| All waters where the salinity is greater than 1 ppth more than 5 percent of the time (i.e., marine water) | Enterococci | 30 | 110 |

RJN, Ex. 11 at P-SVMV412.  The State Bacteria Standards "supersede numeric water quality objectives for bacteria for the REC-1 beneficial use contained in a BASIN PLAN prior to February 4, 2019." *Id*. at  P-SVMV413.

From November 2017 through February 2019, Plaintiff collected samples at six locations within Stevens Creek, one location within Calabazas Creek, two locations within Sunnyvale East Channel and one location within Guadalupe Slough.  Plaintiff relies solely on sampling taken in 2019 to support its motion.  From January 17, 2019 to February 22, 2019, Plaintiff's staff scientist, Wren, collected samples over six weeks, in both dry and wet weather conditions.  Plaintiff collected samples from the MS4 outfalls when the outfall was discharging.

### 1.    Receiving Water Sampling

According to Plaintiff, the samplings show the water bodies at issue exceeded the State Bacteria Standards and Basin Plan Standards, as shown in the tables below.

| Table 1:  WQS and Year 2019 Sampling within Receiving Waters (MPN/100 ml) |
| --- |

---

[8] On April 14, 2010, the Regional Board adopted the Basin Plan Amendment, which includes this version of Table 3-1.  RJN, Ex. 10.

*United States District Court*
*Northern District of California*

|  |  | *E. coli GM* | *E. coli STV* | Entero GM | Entero STV |
|---|---|---|---|---|---|
| **State Bacteria Standard** |  | 100 | 320 | 30 | 110 |
|  |  |  |  |  |  |
|  |  | **Fecal Coliform** | **Fecal Coliform** | **Entero GM** | **Entero** |
| **Basin Plan Standard For Fecal Coliform** |  | 200 | 400 | 35 | no sample > 104 |
|  |  |  |  |  |  |
| **Plaintiff's Results** |  |  |  |  |  |
| **Station** | **City** |  |  |  |  |
| SC-10 | REFERENCE | **24** | **95** | 34 | 304 |
| CC-1 DS | Sunnyvale | **786** | **3,162** | 891 | 5,047 |
| SVC-1 DS | Sunnyvale | **2,976** | **16,486** | 1,101 | 9,364 |
| SVC-3 RW | Sunnyvale | 1,441 | 7692 | **1,381** | **11,387** |
| SC-9 DS | Sunnyvale | **404** | **2,048** | 238 | 4917 |
| SC-7 DS | Mountain View | **1,792** | **6,263** | 962 | 7,408 |
| SC-4 DS | Mountain View | **717** | **3,554** | 304 | 12,294 |

Pl's Mot. at 19-20.[9]  Wren determined that Water Year 2019 sampling demonstrated that the Receiving Waters far exceeded the State *E.coli* and Enterococci geometric mean standards, as well as the *E. coli* and Enterococci statistical value threshold standards at all locations downstream of MS4 outfalls (i.e., all outfalls except for SC-10).  *Id*. at 33-34; *see also* Wren Decl., ¶ 58.  Wren also determined that sampling results showed exceedances of Basin Plan Standards for fecal

---

[9] Defendants asserts that Plaintiff has no water quality for the Guadalupe Slough, which is technically correct.  However, the sampling at both Sunnyvale's MS4 outfall discharging to Sunnyvale East Channel (SVC-1) and at SVC-3, which is near the confluence of the Sunnyvale East Channel and Guadalupe Slough showed high bacteria levels.  Reply PSS 82-91, 107; Wren Decl., ¶ 27, Fig. 1.  Moreover, it is undisputed that stormwater discharges entering Sunnyvale East Channel are carried to Guadalupe Slough.  Reply PSS 22, 23.  Hence, the SVC-1 and SVC-3 samplings support a reasonable inference that Sunnyvale is responsible for bacteria exceedances.  *Cal. Sportfishing Prot. All. v. Shiloh Grp.*, 268 F. Supp. 3d 1029, 1047 (N.D. Cal. 2017) (CWA liability "does not hinge on the fact that the discharge occurred through an MS4 channel, rather than through another type of point source such as a pipe or ditch, as defined by 33 U.S.C. § 1362(14)").

CASE NO.: 5:20-CV-00824-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

United States District Court
Northern District of California

1    coliform and Enterococci.  Wren Decl. ¶ 59.

2         2.    **Outfall Sampling**

3         Plaintiff also conducted outfall sampling, which show bacteria at concentrations orders of

4    magnitude greater than bacteria WQS.  *Id*. ¶ 65.

5         The tables below summarize Plaintiff's test results from each of Defendant's outfalls.

| Table 2: Sunnyvale Outfall Results (MPN/100 ml) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Station | Receiving Water | Date | *E.coli* | Entero | Fecal Coliform | Total Coliform |
| CC-1 Outfall | Calabazas Creek | 3/22/2018 | 341 | 400 | >1,600 | 1,600 |
| CC-1 Outfall | Calabazas Creek | 1/17/2019 | 2,613 | >2,419.6 | | |
| CC-1 Outfall | Calabazas Creek | 2/4/2019 | 2,909 | 16,000 | | |
| CC-1 Outfall | Calabazas Creek | 2/13/2019 | 500 | 3,076 | | |
| SC-9 Outfall | Stevens Creek | 3/1/2018 | 167 | 1,553 | >1,600 | >1,600 |
| SC-9 Outfall | Stevens Creek | 1/17/2019 | 4,611 | 11,000 | | |
| SC-9 Outfall | Stevens Creek | 2/4/2019 | 1,515 | 850 | | |
| SC-9 Outfall | Stevens Creek | 2/13/2019 | 1,450 | 100 | | |
| SV-1 Outfall | Sunnyvale East Channel | 3/22/2018 | 24,196 | 6,867 | >1,600 | >1,600 |

Pl's Mot. at 21.  According to Plaintiff, all samples at Sunnyvale's outfalls show bacteria in

concentrations orders of magnitude greater than bacteria WQS.  Pl.'s Mot. at 20 (citing Wren

Decl. ¶¶ 65, 69-70, Figures 4-5, Ex. 3,5).

| Table 3: Mountain View Outfall Results (MPN/100 ml) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Station | Receiving Water | Date | *E.coli* | Entero | Fecal Coliform | Total Coliform |
| SC-4 Outfall | Stevens Creek | 3/22/2018 | 9,208 | 15,531 | >1,600 | 1,600 |
| SC-4 Outfall | Stevens Creek | 11/16/2017 | 5,475 | 4,611 | | |
| SC-4 Outfall | Stevens Creek | 1/17/2019 | 1,860 | 5,200 | >1,600 | 16,000 |

CASE NO.: 5:20-CV-00824-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .
26

United States District Court
Northern District of California

| SC-4 Outfall | Stevens Creek | 2/4/2019 | 2,480 | 3,300 | | |
| SC-4 Outfall | Stevens Creek | 2/13/2019 | 2,333 | 5,200 | >1,600 | >1,600 |
| SC-5 Outfall | Stevens Creek | 11/16/2017 | 9,804 | 15,531 | >1,600 | 5,400 |
| SC-7 Outfall | Stevens Creek | 11/16/2017 | 4,352 | 8,164 | | |
| SC-7 Outfall | Stevens Creek | 1/17/2019 | 3,255 | 8,200 | | |
| SC-7 Outfall | Stevens Creek | 2/4/2019 | 2,489 | 3,700 | | |
| SC-7 Outfall | Stevens Creek | 2/13/2019 | 2,481 | 4,600 | >1,600 | 6,867 |

*Id.* at 22.  Plaintiff determined that all samples taken during Waters Years 2018 and 2019 at Mountain View's outfalls show bacteria at concentrations orders of magnitude greater than bacteria WQS.  Pl.'s Mot. at 21 (citing Wren Decl., ¶¶ 62, 65, 70, Table 2, Ex. 3).

In sum, **"[o]ut of the twenty-six (26) samples collected in Water Year 2019 at outfalls within the Cities, 100% of the samples were elevated above the State Bacteria Standards STV-based WQS for *E. coli* or Enterococci."** Wren Decl., ¶ 65.

### 3. Reference Site (SC-10)

Plaintiff collected two samples in Water Year 2018 at the reference site (SC-10), in November 2017 and March 2018, and analyzed for total coliforms, fecal coliforms, *E.coli*, and Enterococci, as well as human fecal biomarkers.  Wren. Decl., ¶52, Table 1, Ex. 3.  In Water Year 2019, Plaintiff collected and analyzed an additional six samples for *E. coli* and Enterococci.  Reply PSS 33-38.  No *E. coli* measurements in either Water Year exceeded the State Bacteria Standards.  Pl.'s Mot. at 22 (citing Wren Decl., ¶ 52, Table 1, Ex. 5).  The 2019 Water Year results were also significantly below the Basin Plan Standards for fecal coliform.  RJN, Ex. 9.  Thus, Stevens Creek at SC-10, which is situated above the MS4 outfalls, met Bacteria WQS.  Wren Decl., ¶ 58, Exs. 3,5.  In addition, human biomarkers were not detected at this reference site.  *Id.* ¶71, Ex. 4.

### E. Defendants' Challenges to the Sampling Data

Defendants have not presented any sampling of their own to show that their stormwater discharges comply with bacteria WQS.  Instead, they question the sufficiency of Plaintiff's

United States District Court
Northern District of California

1    sampling data.  Each challenge is discussed separately below.

2              **1.    Evidence of Ongoing Violations**

3        Defendants first assert that Plaintiff's sampling data fails to show ongoing (as opposed to

4    past) violations.  The CWA authorizes private citizens to commence a civil action for injunctive

5    relief and/or the imposition of civil penalties against any person "alleged to be in violation of"

6    specified provisions of the Act.  33 U.S.C. §1365(a).  The CWA confers jurisdiction over citizen

7    suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent

8    violation.  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987).

9    "[A] citizen plaintiff may prove ongoing violations either (1) by proving violations that continue

10   on or after the date the complaint is filed or (2) by adducing evidence from which a reasonable

11   trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic

12   violations."  *Sierra Club v. Union Oil Co.*, 853 F.2d 667, 671 (9th Cir. 1988) (internal quotations

13   omitted).  "[I]ntermittent or sporadic violations do not cease to be ongoing until the date when

14   there is no real likelihood of repetition."  *Comty. Ass'n for Restoration of the Env't v. Henry*

15   *Bosma Dairy*, 305 F.3d 943, 953 (9th Cir. 2002) (quoting *Sierra Club*, 853 F.3d at 67).

16       Here, the last data collected by Baykeeper was in February of 2019, and accordingly there

17   is no direct evidence of violations continuing on or after Plaintiff filed suits against Defendants.

18   However, the Court may look to other circumstantial evidence from which a reasonable trier of

19   fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.  Here,

20   the data from 2018 and 2019, and the absence of any remedial measurements thereafter are

21   sufficient to support the findings.  A comparison of sampling results to the 2019 State Bacteria

22   Standards reinforces the conclusion that Defendants' discharges cause and contribute to bacteria

23   water quality standards within the Receiving Waters and that those violations are ongoing.  *See*

24   *Cal. Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1148-49

25   (E.D. Cal. Sept. 6, 2017) (whether operator was in compliance with recently enacted storm water

26   discharge permit was relevant to issue of continuous violations).  Therefore, the Court rejects

27   CASE NO.: 5:20-CV-00824-EJD

28   ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

*United States District Court*
*Northern District of California*

Defendants' argument that Plaintiff lacks evidence of ongoing violations.

### 2.   Applicability of *E.coli* Test Results to Basin Plan Standards

Defendants contend that the Basin Plan requires a minimum of five consecutive samples equally spaced over a 30-day period, and that Plaintiff has presented only three sets of relevant samples that were taken over a five-month period:  the November 16, 2017, March 1, 2018, and March 22, 2018 samples.  According to Defendants, the samples taken in 2019 are irrelevant because Plaintiffs tested them in accordance with the Basin Plan protocol to determine the presence of *E.coli* or Enterococcus instead of testing them in accordance with applicable State Bacteria to determine the presence of fecal coliform.  In response, Plaintiff argues that *E.coli* and fecal coliform are interchangeable, and therefore test results showing exceedances of *E.coli* establish violations of the State Bacteria Provisions.  Wren Decl., ¶ 54 ("*E.coli* is a type of fecal coliform and, thus, testing for *E.coli* can be compared to the fecal coliform standard.").  Moreover, Plaintiff asserts that "sampling for only *E.coli* likely undercounts the total fecal coliform in the sample, because it is only one form of fecal coliform." *Id.* ¶ 54.

Plaintiff's position is supported by the EPA.  The EPA's website states that *E.coli* "is a single species in the fecal coliform group."  Thorme Reply Decl., Dkt. No. 106-1, Ex. Y, at p.1; *see also In the Matter of Ronald Fricke, Respondent*, 2017 EPA RJO LEXIS 607 ("Analysis . . . revealed . . .  E.coli, a disease-causing type of fecal coliform bacteria."); *In the Matter of Jim Dalinghaus, Respondent*, 2017 EPA RJO LEXIS 755 (same).  The EPA's website explains further:

> *E.coli* is a species of fecal coliform bacteria that is specific to fecal material from humans and other warm-blooded animals.  EPA recommends *E.coli* as the best indicator of health risk from water contact in recreational waters; some states have changed their water quality standards and are monitoring accordingly.

*Id.*; *see also* Wren Reply Decl., Dkt. No. 103-1, ¶ 11, Ex. 33 (Journal of Applied Microbiology 2000, tilted "Escherichia coli: the best biological drinking water indicator for public health protection").  Despite the EPA's guidance above, Defendants urge the Court to disregard

1  Plaintiff's 2019 *E.coli* test results because the EPA's website states: "[i]f your state is still using

2  total or fecal coliforms as the indicator bacteria and you want to know whether the water meets

3  state water quality standards, you should monitor fecal coliforms."  Defs.' Reply at 12 (citing Ex.

4  Y at 1).  However, the word "should" indicates recommended, not mandatory action and the

5  EPA's website indicates a clear preference for *E.coli* testing to assess health risks from

6  recreational water contact.  The Court, therefore, concludes that *E.coli* test results are a reasonable

7  substitute for fecal coliform test results for purposes of determining Defendants' compliance with

8  WQS.[10]

9         **3.**    **Compliance with Basin Plan Requirement to Collect Samples Equally Spaced over 30-days**

10        Defendants next argue that Plaintiff failed to comply with the sampling protocol

11  established in the Basin Plan Standards insofar as Plaintiff failed to collect the requisite five (5)

12  samples equally spaced over thirty (30) days from each location, including outfalls.  In 2019,

13  Plaintiff collected samples on Thursday, January 17th; 6 days later on Wednesday, January 23rd; 9

14  days later on February 1st; 3 days later on February 4th; 9 days later on February 13th; and 9 days

15  later on February 22nd.  Wren Decl., Ex. 5.

16        Plaintiff acknowledges that it did not collect samples equally spaced in time, but argue that

17  a literal reading of "equally spaced" as exact intervals is not practical or realistic.  Reply PSS 39;

18  Maharg Reply Decl., Ex. 47 (Draganchuk Tr. at 64:7-65:3).  There is no contradictory evidence on

19  this issue.  Rather, Defendants' expert, Brandon Steets, agrees that "equally spaced" should not be

20  read strictly, and further, that unevenly spaced sampling "doesn't make the data invalid."  Maharg

21  Reply Decl., Ex. 52 (Steets Tr. at 18:17-19:13).  In Steets' opinion, the five days out of 30-day

22  period sampling protocol is intended to "avoid a situation where you have non-representative

23  data," for example, "[i]f in 30 days, you decide to sample five days in a row" or "[i]f you have

24  exclusively or mostly one weather condition represented."  *Id*. (Steets Tr. at 18:17-19:13).  Here,

25

26  _____

27  [10] Defendants proffer additional reasons why *E.coli* and fecal coliform are not interchangeable, none of which are remotely persuasive and do not warrant discussion herein.

28  ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

United States District Court
Northern District of California

three of Baykeeper's six samples were collected on days with rainfall, and the other three were

collected on days without rainfall.  Reply PSS 39; Wren Reply Decl., ¶¶ 6-9, Ex. 31 at P-

SVMV27725-26.  There is no evidence to suggest Plaintiff's sampling was so unevenly spaced

such that it resulted in non-representative data.  Defendants' speculation that Plaintiff may have

"cherry-picked" its sampling dates to skew results does not create a material dispute of fact.  *See*

*Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and

speculation do not create a factual dispute for purposes of summary judgment").

### 4.    Applicability of Monitoring Requirements Stated in MS4 Permit

Defendants fault Plaintiff for not complying with Provision C.8 of the MS4.  Pl.'s RJN,

Ex. 16, Dkt. No. 84-1.  Specifically, Defendants fault Plaintiff for failing to comply with Provision

C.8.a.iii, which authorizes permittees to "use data collected by a third-party organization, to fulfill

a monitoring requirement, provided the data are demonstrated to meet the data quality objections"

in Provision C.8.b.; Provision C.8.b., which specifies that monitoring data must be "Surface Water

Ambient Monitoring Program (SWAMP) comparable," and that data quality "shall be consistent

with the latest version of the SWAMP Quality Assurance Project Plan (QAPrP)" for certain

parameters; Provision C.8.d.i(2), which requires the sampling crew to be SWAMP trained;

Provision C.8.d.v.(3), which requires permittees to "collect samples in the dry season"; Provision

C.8.d.v.(4), which directs permittees to compare samples to the EPA's statistical threshold value

to determine whether a water body must be identified as a candidate Stressor/Source Identification

("SSID") project; Provision C.8.e, which requires the permittee to take specific actions when

"monitoring results trigger a candidate for a SSID project followup"; and Provision C.8.h., which

requires the permittee to give notice and to submit a report to the Water Board "[w]hen data

collected pursuant to C.8.a.-C.8.g. indicate that discharges are causing or contributing to an

exceedance of an applicable water quality standard."  Defendants imply that because Plaintiff did

not follow Provision C.8, its sampling is unreliable and cannot be used to show violations of

WQS.  Provision C.8, however, places monitoring requirements on permittees and no others.  *See*

United States District Court
Northern District of California

1    MS4 Permit, Dkt No. 84-1 at 131 ("All Permitees shall comply with all the monitoring

2    requirements in this Provision.").  Moreover, courts have found a permitee liable for violations of

3    NPDES permits based on evidence submitted by third-party organizations without considering

4    whether those organizations conducted sampling in accordance with protocols specified in the

5    NPDES permits.  *See*, *e.g.*, *Baykeeper v. Kramer Metals*, 619 F. Supp. 2d 914, 927-28 (C.D. Cal

6    2009) ("*Kramer Metals*"); *State of Georgia v. City of East Ridge, Tenn.*, 949 F. Supp. 1571 (N.D.

7    Ga. 1996).  Defendants have not cited to any case in which a court rejected a third-party

8    organization's data based on a purported failure to comply with testing protocols mandated for

9    permitees.

10       Relatedly, Defendants contend that Plaintiff's data is unreliable because sample results and

11   certification were not verified under penalty of perjury as is required by permitees when samples

12   are collected.  *See* 40 C.F.R. §122.22(d) (data certification requirement).  Defendants, however,

13   have not cited to any case in which a court rejected a third-party organization's data because it was

14   not certified under 40 C.F.R. §122.22(d).  Therefore, the Court rejects Defendants' arguments.

### 5.   Lack of QAPP Compliance re Collecting Samples From Bank

16       Defendants next assert that Plaintiff's data is suspect because Plaintiff made other errors

17   and failed to adhere to its own expert's Quality Assurance Program Plan ("QAPP").  For example,

18   Defendants fault Plaintiff for not following the QAPP requirement to collect samples from the

19   bank or the edge of the bank.  Specifically, Defendants' expert, Steets, opines that photos of a

20   sampling event at CC-1 show samplers in the creek rather than on the creek bank.  Steets' Expert

21   Report, Dkt. No. 83-1, at 27-28.  However, Wren, who prepared the QAPP, explains that the

22   QAPP states a preference for collecting samples from the bank based on safety concerns, not a

23   firm location requirement.  Wren Decl., ¶ 78; Wren Reply Decl., ¶ 26.  Wren explains that

24   sampling at CC-1 "necessitated crossing the creek" in order to access the sampling location.  *Id.*

25       Defendants do not dispute that there are circumstances that necessitate sampling from a

26   location other than the bank.  Instead, Defendants' response is that there were other instances of

United States District Court
Northern District of California

failure to follow QAPP, citing to a photo of Wren which Defendants believe show him taking samples while standing in the water directly upstream of the sampling point. Steets' Expert Report at 28; Steets' Rebuttal Report, Dkt. No. 83-1, at 7. Wren, however, represents that he was perpendicular to the sampling point. Wren Decl., ¶ 79. Moreover, even if Defendants' interpretation of the photo is credited, it does not necessarily follow that Plaintiff's data for CC-1 is unreliable. Plaintiff has other samples from CC-1 that show bacteria levels above the State Bacteria Standards and Basin Plan Standards.

Defendants cite to other photographs, which they contend show additional deviations from QAPP, such as walking in the creek prior to and during sampling. Defs.' Opp'n at 27 n.23. Defendants' expert, Steets, opines that walking in the creek prior to and during sampling can result in contamination from the samplers' boots (Steets' Expert Report at 28), but he does not state definitively that contamination must have occurred. In his rebuttal report, Steets revises his opinion slightly, asserting that it is "likely" that Plaintiff's data is compromised and unreliable. Steets' Rebuttal Report at 7. In the end, there is no evidence that the samplings suffered contamination that rendered the results unreliable. Steets' conclusory statements, based only on his interpretation of photographs, is insufficient to raise a triable issue of fact. *See F.T.C. v. Publishing Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."); *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 928 (C.D. Cal. Feb. 27, 2009) ("conclusory statement that the presence of fecal coliform 'possibly' indicates contamination does not give rise to a genuine issue of material fact as to the validity of these sample").

### 6.    Additional Purported Errors

Defendants next assert that Plaintiff's samples are unreliable because Plaintiff's expert, Wren, purportedly admitted to errors and mislabeled samples. Wren's errata report addresses one error. Wren Reply Decl., ¶ 35 (noting typographical error), Ex 37 (correcting typographical error

United States District Court
Northern District of California

of "February 13, 2019" to "February 22, 2019").  Wren also acknowledges that samples collected at SVC-3 collected in Water Year 2019 were mislabeled as SVC-2 on three occasions, but explains that these errors were corrected during data entry.  *Id.* ¶ 37.  Although the errors may suggest a few lapses in attention to detail, the errors are relatively minor and amount to nothing more than a "scintilla of evidence," which is insufficient to raise a genuine issues as to the reliability of Plaintiff's samples.  *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence . . . will be insufficient [to defeat summary judgment]; there must be evidence on which the jury could reasonably find for the [non-moving party].").  Moreover, there is no evidence that any of Wren's errors led to inaccurate test results.  Wren did not analyze the samples; Alpha Analytical Laboratories, Inc., a state-certified laboratory, did.  Wren Decl., ¶ 44, Ex. 2.

### 7.   Purported Holding Time Issues

Defendants next take issue with the 8-hour hold time for samples specified in Plaintiff's QAPP because it is longer than the 6-hour holding time indicated on the National Environmental Methods Index website, citing Standard Methods 20th edition.  In rebuttal, Plaintiff asserts that the current Standard Methods is the 23rd edition, which allows for an 8-hour hold time.  Wren Reply Decl., ¶ 39, Ex. 38.  All of Plaintiff's samples were collected and processed within an 8-hour hold time, consistent with the QAPP and the 23rd edition of Standard Methods.  *Id.* ¶ 41.  Moreover, there is no evidence that holding times resulted in inaccurate test results.[11]

### F.   Provision C.1.

Lastly, Defendants contend that court intervention for injunctive relief is unnecessary because Provision C.1. of the Regional MS4 Permit specifies corrective actions be taken.  The Court already considered and rejected this argument.  *See* Order Den. Mot. to Dismiss, Dkt. No.

---

[11] Defendants raise additional arguments and evidence in their reply brief.  The Court declines to consider these belated arguments and evidence.  *See Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n. 5 (9th Cir. 2003) (court may decline to consider new issues raised for the first time in the reply brief).

CASE NO.: 5:20-CV-00824-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .

United States District Court
Northern District of California

57, at 20 ("[c]ourts have held that compliance with the iterative process does not excuse liability for violations of water quality standards.").

## IV.    CONCLUSION

For the reasons discussed above, Defendants' motion for leave to file a supplemental brief is DENIED.  Plaintiff's motion for partial summary judgment is GRANTED:  testing results from 2019 support a reasonable inference that Defendants violated Receiving Water Limitation B.2 on January 17, 2019, February 4, 2019, and February 13, 2019.  Defendants' motion for summary judgment is DENIED.

The Court will conduct a status conference on October 13, 2022 at 11:00 a.m.  The parties shall file a joint status conference statement no later than October 3, 2022.

**IT IS SO ORDERED.**

Dated:   September 12, 2022

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

CASE NO.: 5:20-CV-00824-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT . . .