1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6                                SAN JOSE DIVISION

7

8    SAN FRANCISCO BAYKEEPER,              Case No.   5:20-cv-00824-EJD

             Plaintiff,
9                                          **FINAL PRETRIAL ORDER**

10        v.                               Re: ECF Nos. 285, 286, 288, 290, 301, 302,
                                           320, 321, 324, 326, 328, 331
11   CITY OF SUNNYVALE, et al.,

12           Defendants.

13

14         Plaintiff San Francisco Baykeeper filed a citizen suit against the Cities of Sunnyvale and

15   Mountain View under the Clean Water Act.  In its lawsuit, Baykeeper alleges that the Cities are

16   violating two provisions in their National Pollutant Discharge Elimination System (NPDES)

17   permit.  First, Baykeeper alleges that the Cities are not "effectively prohibit[ing] the discharge of

18   non-stormwater . . . into storm drain systems and watercourses" in violation of Discharge

19   Prohibition A.1.  ECF No. 84-1, Ex. 16 (2015 Permit) § A.1.  Second, Baykeeper alleges that the

20   Cities are "caus[ing] or contribut[ing] to a violation of any applicable water quality standard" in

21   violation of Receiving Water Limitation B.2.  *Id.* § B.2.

22         Before the Court are several pretrial disputes: motions in limine (MILs) (ECF Nos. 285,

23   286, 288, 290, 301, 302, 321), motions to amend (ECF Nos. 320, 324), a disagreement over

24   standing (ECF Nos. 326, 328), and an objection to late-disclosed witnesses and evidence (ECF

25   No. 331).  The Court resolves them as follows.

26

27

28

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# I.    MOTIONS IN LIMINE[1]

## A.    Cities' MIL No. 1 (ECF No. 285)

The Cities first move the Court to exclude all evidence related to two waterbodies: the Sunnyvale East Channel and Guadalupe Slough.  The Cities argue that, because the Court held Baykeeper lacks standing to raise claims as to these waterbodies, evidence related to these waterbodies is irrelevant and more prejudicial than probative under Rules 401, 402, and 403.

Evidence is relevant if it "'has any tendency to make a fact more or less probable' and that fact 'is of consequence in determining the action.'"  *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (quoting Fed. R. Evid. 401).  This is a low bar.  *Id.* at 666.  Evidence about the East Channel and Slough clears that low bar because it contributes to the causation analysis for Limitation B.2 violations.  Limitation B.2 bars the Cities from "caus[ing] or contribut[ing]" to water quality violations.  2015 Permit § B.2.  Both the East Channel and Slough are upstream from waterbodies for which Baykeeper does have standing to assert B.2 violations (the Receiving Waters).  Pollution from the East Channel and Slough can flow downstream into the Receiving Waters.  So, pollution in the East Channel and Slough can cause or contribute to water quality violations in the Receiving Waters.  By extension, evidence showing that the Cities caused or contributed to pollution in the East Channel or Slough may have a tendency to show that the Cities caused or contributed to a water quality violation downstream in the Receiving Waters.

Because evidence related to the East Channel and Slough is relevant, it is admissible unless there is a separate rule or law saying otherwise.  Fed. R. Evid. 402.  The Cities point to Rule 403 as such a rule.  Rule 403 permits a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of . . . unfair prejudice" or some other countervailing consideration.  Fed. R. Evid. 403.  Because Rule 403 applies only when the probative value of evidence is "*substantially* outweighed" by countervailing considerations, it "sets a high bar for exclusion."  *Sidibe v. Sutter Health*, 103 F.4th 675, 691 (9th Cir. 2024).  Courts "must be cautious

---

[1] Unless otherwise indicated, citations to the Rules in this section are to the Federal Rules of Evidence.

Case No.: 5:20-cv-00824-EJD
FINAL PRETRIAL ORDER            2

1   and sparing" in their use of Rule 403.  *Id.* (quoting *United States v. Hankey*, 203 F.3d 1160, 1172

2   (9th Cir. 2000)).  Moreover, this case is being decided by bench trial, and "in a bench trial, the risk

3   that a verdict will be affected unfairly and substantially by the admission of irrelevant evidence is

4   far less than in a jury trial."  *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994).

5   Courts are well-versed in separating a piece of evidence's probative force from its potentially

6   prejudicial effect.

7       Evidence about the East Channel and Slough would not be prejudicial unless Baykeeper's

8   lack of standing precludes it from seeking liability for violations in those two waterbodies.  In

9   Baykeeper's view, its standing in the Receiving Waters permits it to raise violations in upstream

10  waterbodies like the East Channel and Slough.  The Court need not decide now whether

11  Baykeeper is correct.  Either way, evidence about the East Channel and Slough is admissible.  It

12  would be more prudent to defer any decision on whether the Cities may face liability for violations

13  in the East Channel or Slough, especially since the Cities have not had a chance to provide a

14  fulsome, written response to Baykeeper's argument due to the limited briefing allowed on motions

15  in limine.

16      The parties should address this issue—whether Baykeeper's standing in the Receiving

17  Waters allows it to assert liability for violations in the East Channel and Slough—in posttrial

18  briefing.  If the Court concludes that Baykeeper may not assert liability for such violations, the

19  Court will not use evidence about the East Channel or Slough for the purpose of determining if

20  such violations occurred.  Accordingly, the Court **DENIES** the Cities' MIL No. 1.

21      **B.    Cities' MIL No. 2 (ECF No. 286)**

22      Next, the Cities ask the Court to exclude argument or evidence about violations of

23  Limitation B.2 that postdates Baykeeper's water quality sampling in February 2019.  The Cities

24  take a somewhat scattershot approach to this MIL, invoking arguments under a bevy of Rules,

25  including Rules 401, 402, 403, and 702.[2]  However, all those arguments boil down to two themes:

26  (1) that the post-February 2019 evidence and water sampling was so sparse that it could not

27

28  _____
    [2] The Cities also cite Rule 703, but they advance no argument based on that Rule.

United States District Court
Northern District of California

1    establish any water quality violation as a matter of law, and (2) that no violations of the 2022

2    Permit are at issue, so evidence and argument postdating the issuance of the 2022 Permit is

3    irrelevant.  The Court addresses these themes in turn.

4         The Cities' first set of arguments centers around the fact that water quality standards are

5    measured "[b]ased on a minimum of five consecutive samples equally spaced over a 30-day

6    period."  ECF No. 84-1, Ex. 9.  These standards require multiple measurements because they are

7    calculated based on various types of averages or other statistical measures.  *Id.*  Computing those

8    values necessarily requires a series of tests, not just a single one.  Baykeeper did not conduct such

9    a series of tests post-February 2019.  Rather, it conducted a single test on April 16, 2022.  Wren

10   Decl. at 40:7–42:24, ECF No. 291-4 ("The only sampling event that's been performed since 2019

11   was the single sampling event on April 16, 2022.").  And while the Cities' own testing fills in

12   some gaps, the Cities point out that they at most performed one test per month for any Receiving

13   Water, which is not enough to meet the five-samples-over-thirty-days baseline for measuring

14   water quality.  Wren Rep. at 2, ECF No. 291-1; 5/1 Thorne Decl. ¶ 2, ECF No. 291.  So, say the

15   Cities, Baykeeper simply does not have enough data to show any water quality violations.

16        Although the Cities frame these arguments as evidentiary in nature, the Cities are

17   essentially advancing their merits argument.  Motions in limine, however, are "used to obtain

18   pretrial rulings on the admissibility of evidence, not to determine the sufficiency of the evidence or

19   the merits of an issue."  *Franssen Condo. Ass'n of Apartment Owners v. Country Mut. Ins. Co.*,

20   No. 2:21-cv-00295, 2022 WL 17176845, at *3 (W.D. Wash. Nov. 23, 2022) (quoting *Williams v.*

21   *Rushmore Loan Mgmt. Servs. LLC*, No. 3:15-cv-673, 2017 WL 822793, at *1 (D. Conn. Mar. 2,

22   2017)); *see also PersonalWeb Techs. LLC v. Int'l Bus. Machs. Corp.*, No. 16-cv-01266, 2017 WL

23   8186294, at *3 (N.D. Cal. July 25, 2017).  They are "not the proper vehicle for seeking a

24   dispositive ruling on a claim."  *Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1162 n.4 (9th Cir.

25   2013).  Questions going to the merits go to weight, not admissibility.  For that reason alone, the

26   Court rejects the Cities' first set of arguments.

27        Even taken at face value, these arguments do not merit exclusion of evidence.  The Cities'

28   relevance arguments reflect the distinction between direct and circumstantial evidence.  If

United States District Court
Northern District of California

1  Baykeeper were able to present five tests within thirty days showing a water quality violation, that

2  would be direct evidence of such a violation. But a single test combined with other circumstantial

3  evidence could still allow the fact finder to infer a water quality violation. The Cities believe there

4  is not enough circumstantial evidence to make such an inference. They may be right, but that is an

5  issue for trial. As an evidentiary matter, "circumstantial and direct evidence should be treated

6  alike." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). Consequently, the

7  post-2019 evidence should not be excluded as irrelevant or prejudicial under Rules 401, 402, or

8  403. The Cities' expert objections under Rule 702 are based on the same grounds, so the Court

9  rejects them for the same reasons.[3]

10      As for the Cities' second set of arguments about the supposed irrelevance of any post-2022

11  evidence due to the lack of claims in this case for violation of the 2022 Permit, the Court has

12  already rejected that argument in a previous order. ECF No. 270 at 4–6.

13      The Court **DENIES** the Cities' MIL No. 2.

14      **C.    Cities' MIL No. 3 (ECF No. 288)**

15      The Cities also move to exclude all evidence related to non-exfiltration discharges of non-

16  stormwater. This request relates to Prohibition A.1, which requires the Cities to "effectively

17  prohibit the discharge of non-stormwater." 2015 Permit § A.1. Baykeeper's initial theory was

18  that the Cities violated this provision by allowing exfiltration sources of non-stormwater—from

19  leaks in the Cities' sewage systems—to discharge into waterways. Sunnyvale Compl, ECF No. 1;

20  Mountain View Compl., Case No. 5:20-cv-00826, ECF No. 1. Later, Baykeeper amended its

21  complaints to also allege that non-exfiltration sources unrelated to the Cities' sewage systems,

22  including "outdoor defecation, pet waste, [and] trash receptacle leachate," contributed to A.1

23  violations. Sunnyvale SAC ¶ 106, ECF No. 140; Mountain View SAC ¶ 96, ECF No. 141. The

24  Cities contend that the Court must exclude evidence of the latter under Federal Rules of Civil

25

26

---

27  [3] The same logic applies to the Cities' argument about the lack of "paired" sampling between the Receiving Waters and outfalls where the Cities discharge stormwater, which is likewise a merits argument.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Procedure 26(a) and 37(c).[4]

2        Rules 26(a) and 37(c) work in tandem "to allow the parties to adequately prepare their

3    cases for trial and to avoid unfair surprise."  *United States ex rel. Brown v. Celgene Corp.*, No.

4    10-cv-3165, 2015 WL 12731823, at *2 (C.D. Cal. July 24, 2015) (quoting *Russell v. Absolute*

5    *Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014)).   Rule 26(a) requires parties to make

6    certain pretrial disclosures of relevant witnesses and evidence while Rule 37(c) provides an

7    enforcement mechanism by requiring courts to exclude undisclosed witnesses or evidence "unless

8    the failure [to] disclose was substantially justified or harmless."  Fed. R. Civ. P. 26(a); Fed. R.

9    Civ. P. 37(c)(1).

10        To determine whether exclusion under Rule 37(c) is warranted, the Court must know

11    exactly what evidence or witness was allegedly not disclosed.  The Cities do not identify that

12    information.  Instead, they appear to take issue with Baykeeper's entire theory of non-exfiltration

13    sources.  That is not grounds for Rule 37 exclusion, and in any case, Baykeeper disclosed this

14    theory to the Cities years ago when Baykeeper amended its complaints in 2022.  *See* Sunnyvale

15    SAC; Mountain View SAC.

16        The closest that the Cities come to identifying specific witnesses is when they raise

17    concerns that Baykeeper's experts may testify about non-exfiltration sources in ways that go

18    beyond their reports.  On that point, the Court observes that an expert's trial testimony is limited to

19    her report.  *See Hidden Empire Holdings, LLC v. Angelone*, No. 22-cv-6515, 2024 WL 2104389,

20    at *3 (C.D. Cal. Mar. 6, 2024); *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393, 2015

21    WL 5258786, at *1 n.1 (N.D. Cal. Sept. 8, 2015); *Med. Instrumentation & Diagnostics Corp. v.*

22    *Elekta AB*, No. 97-cv-2271, 2002 WL 34714563, at *2 (S.D. Cal. Jan. 14, 2002).  However, any

23    arguments about experts exceeding the scope of their report are better handled via cross-

24    examination and impeachment at trial, when the Court will have a precise piece of testimony it can

25    assess.  Because this case will be decided by bench trial, this Court "may hear from an expert and

26    make any necessary admissibility determinations later."  *Su v. Reliance Tr. Co.*, No. 19-cv-3178,

27

28    ───────────────
[4] The Cities also cite Rules 104(a) and 702, but they advance no arguments based on those Rules.

1    2023 WL 8715627, at *2 (D. Ariz. Dec. 18, 2023) (citing *United States v. Flores*, 901 F.3d 1150,

2    1165 (9th Cir. 2018)).

3        Therefore, the Court **DENIES** the Cities' MIL No. 3 without prejudice to the Cities ability

4    to raise Rule 37 objections to specific witnesses or pieces of evidence, or to move to strike

5    testimony following cross-examination at trial on the basis that Baykeeper's experts have gone

6    beyond the scope of their reports.

7        **D.    Cities' MIL No. 4 (ECF No. 290)**

8        Lastly, the Cities seek to exclude Baykeeper's economic expert, Jonathan Shefftz, on the

9    basis that his opinions are unreliable or irrelevant under Rule 702.  Specifically, the Cities seek to

10    exclude Shefftz's opinion on the benefits the Cities gained by not complying with their permits.

11        First, the Cities claim that Shefftz based his opinion on relief that the Court is no longer

12    able to order.  That is a merits question and therefore does not require exclusion.  *See supra*

13    Section I.B.  In any case, the Court can receive Shefftz's testimony and then determine, after

14    deciding what, if any, injunctive relief is appropriate, whether Shefftz's opinion is helpful in light

15    of the injunctive relief granted.  *See Su*, 2023 WL 8715627, at *2.

16        Second, the Cities argue that Shefftz's opinion is stale because Shefftz did not update his

17    opinion with post-2021 data.  While that might prevent Shefftz from properly opining on any

18    economic benefits to the Cities post-2021, the Cities' concern does nothing to undermine the value

19    of Shefftz's opinions for the pre-2021 period.

20        The Court **DENIES** the Cities' MIL No. 4.

21        **E.    Baykeeper's MIL No. 1 (ECF No. 301)**

22        Baykeeper moves to exclude the supplemental opinions of Dr. Mark Berkman, the Cities'

23    economic expert.  Baykeeper raises two grounds for exclusion.  First, Baykeeper asserts that Dr.

24    Berkman's supplemental opinions went beyond the scope of discovery and therefore must be

25    excluded under Federal Rules of Civil Procedure 26(e) and 37(c).  Second, Baykeeper argues that,

26    to the extent Dr. Berkman's supplemental opinions fall within the scope of discovery, they must

27    be excluded as unreliable under Rule 702.

28

The Court starts with the argument regarding scope of reopened discovery.  On February 3, 2025, the Court reopened discovery for two limited purposes: "(1) to add the Cities' annual water quality reports and updated geographic and pipe system data to the record; and (2) to allow the parties' experts to submit supplemental reports based on this additional information."  ECF No. 270 at 6–7.  In doing so, the Court narrowly limited new expert discovery.  Experts could only offer new opinions that were based on the annual reports or geographic and pipe system data themselves, or that responded to another expert's new opinions based on that information.  The Court did not permit a broad reopening of expert discovery to address any topic that the annual reports or geographic and pipe system data touched on.  Any opinions falling outside this narrow scope are not properly offered into the record in this case, so experts may not testify as to such opinions at trial.  *See supra* Section I.C.

For this reason, any of Dr. Berkman's supplemental opinions based on new information other than the Cities' annual reports or the geographic and pipe system data themselves must be excluded.  This includes opinions based on new U.S. Census data and new financial data from the Cities (so far as that financial data is not in the Cities' annual reports).  However, opinions and testimony related to the Cities' request to redesignate the beneficial use of certain waters from REC-1 (water contact) to REC-2 (non-water contact) are admissible because the Cities' request is contained in one of their reports.[5]

As for Baykeeper's second argument about reliability, the Court finds that those issues go to weight, not admissibility.  Baykeeper asserts that Dr. Berkman used unreliable data because the data included costs and expenditures that go beyond the issues for trial.  However, "experts' decisions about what data to use in their analysis bear on the weight, not the admissibility of expert testimony."  *JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295, 1310 (N.D. Cal. 2022) (quoting *United States ex rel. Bergelectric Corp. v. Sauer, Inc.*, No. 5:18-cv-00612, 2020 WL 470273, at *2 (N.D. Cal. Jan. 29, 2020)); *see also Hamm v. Mercedes-Benz USA, LLC*, No. 5:16-cv-03370, 2021 WL 1238304, at *14 (N.D. Cal. Apr. 2, 2021) (collecting cases).

---

[5] The Court declines Baykeeper's request to sanction the Cities under Rule 37.

1    Baykeeper also claims that Dr. Berkman is serving merely as a conduit for other

2  individuals' analyses because he did not know how to interpret the relevant expenditure data.  So

3  far as Dr. Berkman relied on data produced by others, that is no barrier to admitting his expert

4  opinions.  The Rules expressly allow experts to rely on data collected by others.  Fed. R. Evid.

5  703; *see also Wolkowitz v. Lerner*, No. 07-cv-777, 2008 WL 1885770, at *4 (C.D. Cal. Apr. 21,

6  2008) (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997)).  To

7  the extent that Baykeeper believes Dr. Berkman relied not only on data collected by others but

8  also their analyses, that possibility should be tested by cross-examination at trial.  Based on the

9  testimony at trial, the Court will determine whether Dr. Berkman's opinions should be credited.

10  *See Su*, 2023 WL 8715627, at *2.

11    The Court therefore **GRANTS IN PART** and **DENIES IN PART** Baykeeper's MIL

12  No. 1.  The Court excludes Dr. Berkman's supplemental opinions except to the extent they are

13  based on the Cities' request to redesignate beneficial uses.

14    **F.    Baykeeper's MIL No. 2 (ECF No. 302)**

15    Baykeeper also moves to exclude portions of the supplemental opinions of Brandon Steets,

16  the Cities' expert in stormwater management.  Baykeeper makes four arguments that the Court

17  addresses in sequence.

18    Baykeeper begins by arguing that several of Steets' supplemental opinions are

19  impermissible legal conclusions.  Baykeeper is correct that "experts may not give opinions as to

20  legal conclusions."  *Cypress Ins. Co. v. SK Hynix Am., Inc.*, No. 2:17-cv-00467, 2019 WL 634684,

21  at *2 (W.D. Wash. Feb. 14, 2019) (collecting cases).  But even though experts may not opine on

22  ultimate issues of law, they may opine on ultimate issues of fact under Rule 704.  *See United*

23  *States v. Diaz*, 876 F.3d 1194, 1196–97 (9th Cir. 2017) (distinguishing law from fact in the context

24  of expert testimony).  In this case, law and fact are closely intertwined, making it difficult for the

25  Court to determine whether an expert's testimony crosses from fact to law without having the

26  particular testimony before it.  That being so, it is prudent to defer the issues posed by this

27  argument to trial, when the Court will have particular testimony to evaluate.  Further, the Court is

28  well-equipped to separate law from fact, and it will not credit expert opinions on the law.  *See*

United States District Court
Northern District of California

Case No.: 5:20-cv-00824-EJD

1    *F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) ("[W]e are mindful that there is less

2    danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench

3    trial.") (internal quotations and citation omitted).  To streamline proceedings, if the parties wish,

4    the Court will construe this argument as a standing objection to expert legal conclusions for

5    purposes of preserving appellate rights, so the parties need not separately object at trial to each

6    purported legal conclusion.

7        Next, Baykeeper contends that certain of Steets' supplemental opinions fall outside the

8    scope of reopened discovery.  As Baykeeper clarified at the pretrial conference, it specifically

9    seeks to exclude Steets' Supplemental Opinion 5 on this ground.  Since Steets' himself conceded

10   at deposition that he did not rely on the annual reports or geographic and pipe system data for that

11   opinion, and the Cities did not suggest otherwise at the pretrial conference, the Court finds that

12   Supplemental Opinion 5 exceeds the scope of reopened discovery and excludes it for that reason.

13   *See* 5/14 Maharg Decl. ¶ 4, ECF No. 304.

14       Finally, Baykeeper asks the Court to exclude Steets' rebuttal of a supplemental opinion by

15   Baykeeper's expert, Kevin Draganchuck, on the grounds that Steets is serving as a conduit for

16   other individuals' analyses.  The Court resolves this argument the same way it resolved the similar

17   argument for Dr. Berkman: Baykeeper should probe this issue on cross-examination, and the

18   Court will determine whether to credit Steets' opinions when making its findings of fact and

19   conclusions of law.

20       The Court therefore **GRANTS IN PART** and **DENIES IN PART** Baykeeper's MIL

21   No. 2.  The Court excludes Supplemental Opinion 5 but permits Steets to testify on the remainder

22   of his Supplemental Opinions.

23       **G.    Baykeeper's MIL No. 3 (ECF No. 321)**

24       With its final MIL, Baykeeper asks the Court to exclude all evidence and argument

25   regarding the Cities' equitable defenses.  Baykeeper believes that such exclusion is necessary

26   because equitable defenses are categorically barred in citizen suits under the Clean Water Act.

27       Baykeeper's argument has some force.  The argument begins with the long judicial

28   tradition of limiting the availability of equitable defenses against the federal government.  *See*

1    *United States v. Summerlin*, 310 U.S. 414, 413 ("It is well settled that the United States is not . . .

2    subject to the defense of laches in enforcing its rights."); *Utah Power & Light Co. v. United States*,

3    243 U.S. 389, 408–09 (1917) (rejecting equitable estoppel against the government).  The basic

4    rationale for this rule is that the government "holds its interests . . . in trust for all the people,"

5    meaning that the government acts on behalf of the entire public.  *United States v. California*, 332

6    U.S. 19, 40 (1947), *superseded by statute*, Submerged Lands Act, 67 Stat. 29, *as recognized in*

7    *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601 (2019).  Because equitable defenses

8    can arise only if individuals working for the government make mistakes, and those individual

9    mistakes should not restrict enforcement of the public's rights and interests, courts have declined

10   to enforce equitable defenses against the government.  *Id.*  Meanwhile, citizen enforcement actions

11   like this one "greatly resemble government enforcement . . . actions."  *Sierra Club v. Chevron*

12   *U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987).  In Clean Water Act citizen actions specifically,

13   the Ninth Circuit has explained that "citizen plaintiffs effectively stand in the shoes of the EPA."

14   *Id.*  From this, Baykeeper concludes that it should receive the same protections against equitable

15   defenses that the government would receive.

16         However, the Ninth Circuit has never gone so far.  It has cautioned only that equitable

17   defenses are "to be invoked sparingly in environmental cases because the plaintiff is not the only

18   party to suffer harm by alleged environmental damage."  *Ocean Advocs. v. U.S. Army Corps of*

19   *Eng'rs*, 402 F.3d 846, 862 (9th Cir. 2005) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest*

20   *Serv.*, 137 F.3d 1372, 1381 (9th Cir. 1998)).  In doing so, the Ninth Circuit has implicitly

21   recognized that there are "sparing" situations in which it can be appropriate to invoke an equitable

22   defense against a citizen suit.  Had the Ninth Circuit meant to foreclose equitable defenses

23   completely, it could have clearly said so.  Instead, it has repeatedly used the same "sparingly"

24   language.  *E.g., id.*; *Portland Audubon Soc'y v. Lujan*, 884 F.2d 1233, 1241 (9th Cir. 1989); *Pres.*

25   *Coal., Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir. 1982); *see also, e.g.*, *Coal. for Canyon Pres. v.*

26   *Bowers*, 632 F.2d 774, 779 (9th Cir. 1980) (Kennedy, J.) (equitable defenses "not [] favored").

27

28

1    For these reasons, the Court concludes that equitable defenses are allowed, although the

2 showing that the Cities must make to defeat Baykeeper's claim for injunctive relief[6] is high in the

3 citizen-suit context. The Court **DENIES** Baykeeper's MIL No. 3.

## II.    MOTIONS TO AMEND[7]

5    Both Baykeeper and the Cities move to amend their pleadings. Because the deadline for

6 amendment has passed, they must first satisfy Rule 16(b)'s good cause standard. *Kamal v. Eden*

7 *Creamery, LLC*, 88 F.4th 1268, 1277 (9th Cir. 2023). Whether good cause exists primarily turns

8 on "the diligence of the party seeking the amendment." *In re W. States Wholesale Nat. Gas*

9 *Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013) (quoting *Johnson v. Mammoth Recreations,*

10 *Inc.*, 975 F.3d 604, 609 (9th Cir. 1992)). While prejudice to the party opposing amendment

11 "might supply additional reasons to deny a motion," a lack of diligence by the party seeking

12 amendment is enough to defeat a motion for leave to amend. *Kamal*, 88 F.4th at 1277 (quoting

13 *Johnson*, 975 F.2d at 609).

14    If a party shows good cause under Rule 16(b), it must then show that amendment is proper

15 under Rule 15. *Chang v. Cashman*, 723 F. Supp. 3d 772, 779 (N.D. Cal. 2024). Courts should

16 liberally permit amendment under Rule 15. *Waldrip v. Hall*, 548 F.3d 729, 732 (9th Cir. 2008).

17 "When considering whether to grant leave to amend, a district court should consider several

18 factors including undue delay, the movant's bad faith or dilatory motive, repeated failure to cure

19 deficiencies by amendments previously allowed, undue prejudice to the opposing party, and

20 futility." *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020). Prejudice is the

21 most important of these factors. *Id.*

### A.    Baykeeper's Motion (ECF No. 320)

23    Baykeeper moves to amend its complaints against the Cities in two respects: (1) to clarify

24 that it is alleging violations Prohibition A.1 and Limitation B.2 of the NPDES permit that was

---

[6] The Court also observes that the Cities seek only to challenge injunctive relief through their equitable defenses, not to defeat the entirety of Baykeeper's claims. This reduces the concerns about invoking equitable defenses to defeat relief that the public might be entitled to.

[7] Unless otherwise indicated, citations to the Rules in this section are to the Federal Rules of Civil Procedure.

1    issued during the pendency of this litigation, ECF No. 145, Ex. A (2022 Permit), and (2) to add a

2    claim for violation of Provision C.14 in that new permit.

3            Baykeeper has not shown good cause to add violations of Prohibition A.1 and Limitation

4    B.2 under the 2022 Permit.  The regional water board responsible for the Cities' NPDES permits

5    issued the 2022 Permit on May 11, 2022.  *See* 2022 Permit.  Baykeeper has therefore been on

6    notice of the new permit for over three years.  What is more, the Cities made their position on the

7    2022 Permit clear to Baykeeper a year ago, when the Cities filed a notice asserting that "trial

8    should be limited to violations alleged under the 2015 Permit since Baykeeper's currently

9    applicable Complaint does not allege any violations of the 2022 Permit."  ECF No. 216 at 8.  Yet,

10   Baykeeper did not move to amend its complaints until just two weeks before trial.  That is far from

11   diligent.

12           To be sure, it was Baykeeper's position that it did not need to amend its complaints to

13   pursue claims under the 2022 Permit.  ECF No. 215 at 7, 9.  But Baykeeper could easily have

14   staked that position while simultaneously moving for leave to amend to eliminate any doubt about

15   the status of the 2022 Permit in this case.  By choosing to rest on its argument without moving for

16   leave to amend, Baykeeper took the risk that the Court would disagree with that argument and

17   then deny leave to amend when Baykeeper moved to do so belatedly.  Indeed, that risk has now

18   materialized.

19           Baykeeper was not diligent about amending its complaints to include violations of

20   Provision A.1 and Limitation B.2 under the 2022 Permit, so it may not amend to include those

21   claims.

22           The addition of a new claim for violation of Provision C.14 poses a slightly different issue,

23   but the final result is the same.  Baykeeper intends to allege violations of Provision C.14's

24   monitoring and reporting requirements.  2022 Permit §§ C.14.a.viii–ix; Proposed Compl. ¶¶ 162–

25   65, ECF No. 325, Ex. A.  The basis for those violations—a document known as the Mid-

26   Interpretive Report—was not available to Baykeeper until the Cities submitted the report to the

27   regional water board on March 31, 2025.  Cooper Decl. ¶ 5, ECF No. 320-2.  From there, says

28   Baykeeper, it took several more weeks for experts to review that report and confirm the viability

Case No.: 5:20-cv-00824-EJD

FINAL PRETRIAL ORDER            13

1    of a C.14 claim. *Id.* ¶¶ 6–7. Assuming that Baykeeper's account constitutes good cause, the Court

2    nonetheless denies leave to add a C.14 claim because doing so would be futile under Rule 15.

3          Before a private party may file a citizen suit under the Clean Water Act, it must provide

4    60-day notice of intent to sue. *Cottonwood Env't L. Ctr. v. Edwards*, 86 F.4th 1255, 1264 (9th

5    Cir. 2023). Such notice is jurisdictional; courts lack subject matter jurisdiction over citizen suits

6    not preceded by notice. *Id.* For a notice to be sufficient, it must "tell[] a target precisely what it

7    allegedly did wrong, and when," and it must do so with "reasonable specificity." *Id.* (first quoting

8    *Ctr. For Biological Diversity v. Marina Point Dev.*, 566 F.3d 794, 800 (9th Cir. 2009) (en banc);

9    then quoting *S.F. BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir. 2002)).

10         Provision C.14 was newly added to the 2022 Permit—nothing similar to it was in the 2015

11   permit. *Compare* 2022 Permit, *with* 2015 Permit. Yet, Baykeeper did not send the Cities a new

12   notice once the regional water board issued the 2022 Permit. So, the Court does not have

13   jurisdiction over Baykeeper's proposed C.14 claim unless Baykeeper's earlier notices to the

14   Cities, provided at the outset of this litigation, can be read to fairly encompass the proposed claim.

15   Those earlier notices cannot be read to do so. The earlier notices describe the Cities' allegedly

16   wrongful conduct in terms of discharges into waterways. ECF No. 1-1 at 9–12 (Sunnyvale); Case

17   No. 5:20-cv-00826, ECF No. 1-1 at 9–11 (Mountain View). The notices did not identify any

18   failures of water quality monitoring or reporting. Since Baykeeper's proposed C.14 claim is based

19   on alleged monitoring and reporting violations, Baykeeper's earlier notices are not sufficient to

20   support that claim. The Court would lack jurisdiction over Baykeeper's proposed C.14 claim.

21         Accordingly, Baykeeper may not amend its complaints to add a C.14 claim, and the Court

22   **DENIES** Baykeeper's motion to amend in its entirety.

23         **B.    The Cities' Motion (ECF No. 324)**

24         The Cities move to amend their answers to add two new affirmative defenses based on due

25   process: (1) that the permit provisions at issue are void for vagueness; and (2) that the Cities have

26   been denied judicial review of those permit provisions.

27         The Cities lack good cause to add a void-for-vagueness defense at this late juncture.

28   According to the Cities, this defense did not become apparent until the Supreme Court issued its

Case No.: 5:20-cv-00824-EJD

United States District Court
Northern District of California

1  decision in *City and County of San Francisco v. EPA*, 145 S. Ct 704 (2025) (*CCSF II*), on March

2  4, 2025.  Ostensibly, that is because *CCSF II* criticized the vagueness of "end-result" limitations

3  that make regulated entities responsible for water quality in a given waterbody—the same kind of

4  limitation at issue in this case.

5  There are at least two problems with this explanation.  For one, *CCSF II* was not a void-

6  for-vagueness case.  Rather, it addressed the EPA's statutory authority.  So, it cannot be said that

7  *CCSF II* ratified a void-for-vagueness challenge that was previously unavailable.  At best, it

8  simply called attention to vagueness as a potential concern.  *See CCSF II*, 145 S. Ct. at 717–18

9  (expressing concern that end-result limitations fail to provide notice of what NPDES permittees

10  must do to avoid violating their permits).  More fundamentally, the Cities should have been aware

11  of their void-for-vagueness defense from the very beginning of this case.  If the NPDES permits at

12  issue are unconstitutionally vague now, they were unconstitutionally vague when Baykeeper first

13  filed suit—the permits' language has not changed.  The Cities' belated recognition of this possible

14  defense, even if that recognition was aided by an intervening Supreme Court decision, is not good

15  cause.

16  The Cities do have good cause to add their lack-of-judicial-review defense.  While *CCSF

17  II* did not help the Cities' void-for-vagueness defense, that case did reveal another previously

18  unavailable defense.  In earlier proceedings, the Ninth Circuit held the Clean Water Act permitted

19  end-result limitations.  *City & Cnty. of S.F. v. U.S. EPA*, 75 F.4th 1074, 1090–91, 1093 (9th Cir.

20  2023) (*CCSF I*).  Thus, under then-standing Ninth Circuit precedent, the Cities could not challenge

21  permit provisions on the basis that they were impermissible end-result limitations.  *CCSF II*

22  expressly reversed the Ninth Circuit's decision in *CCSF I*, holding that the Clean Water Act does

23  not authorize such limitations.  *CCSF II*, 145 S. Ct. at 720.

24  The Cities promptly pursued that new defense in this case, asking for leave to file a motion

25  for reconsideration the same day that the Supreme Court issued *CCSF II*.  ECF No. 276.  The

26  Court ultimately denied reconsideration on May 12, 2025, finding that the Cities could not

27  collaterally attack permit validity in a Clean Water Act enforcement action.  ECF No. 300.  It was

28  only at that point that the Cities recognized that they would not be able to raise permit validity

United States District Court
Northern District of California

1   challenges in this action.  And due to the procedural posture of various permit challenges in the

2   state courts, the Cities believed that they could not raise permit validity challenges there, either.

3   5/27 Thorme Decl. ¶ 5, ECF No. 324-1.  That is, the Cities did not realize that they may have been

4   effectively barred from judicial review of their permit validity challenge until both *CCSF II* and

5   this Court's reconsideration order were decided.  The Cities then raised their lack-of-judicial-

6   review defense just three days later, on May 15, 2025.  Pretrial Statement at 9, ECF No. 308.  That

7   is diligent enough to constitute good cause.

8        Still, the Cities may not add their lack-of-judicial-review defense because it is futile under

9   Rule 15.  At the threshold, it appears that the Cities lack the ability to assert a due process defense.

10  The Cities, as municipal entities, "have no standing to invoke . . . the provisions of the Fourteenth

11  Amendment of the Constitution [which includes the Due Process Clause] in opposition to the will

12  of their creator," California in this instance.  *Coleman v. Miller*, 307 U.S. 433, 441 (1939).  The

13  availability of a due process defense, then, depends on the answer to this question:  Who allegedly

14  violated the Cities' due process rights?  Based on discussion at the pretrial conference, there seem

15  to be two possibilities.  First, California may have deprived the Cities of due process by not

16  allowing for judicial review under state law.  Second, the Cities suggested that Baykeeper

17  deprived them of due process.  If the former, *Coleman* bars the Cities' defense.  If the latter, it is

18  not clear how a private actor like Baykeeper could provide or deny judicial review to the Cities.

19  And that is before delving into the thorny question of whether the state action requirement has

20  been met.  *See Drach v. Am. Kennel Club, Inc.*, 53 F.3d 338 (9th Cir. 1995) ("[T]o assert a denial

21  of due process under the United States Constitution, [a party] must show the existence of state

22  action.").

23        Regardless, the Cities' due process defense fails because there is no due process right to

24  raise changes in law retroactively.  The Cities are not seriously arguing that judicial review of their

25  permits was cut off completely.  California law gives them the right challenge their permits and

26  seek judicial review, first before the state water board and then before the state courts.  Cal. Water

27  Code §§ 13320, 13330.  Rather, the Cities appear to be protesting their inability to raise *CCSF II*

28  as a defense.  But "retroactivity in civil cases must be limited by the need for finality." *James B.*

Case No.: 5:20-cv-00824-EJD

FINAL PRETRIAL ORDER                16

*Beam Distilling Co. v. Georgia*, 501 U.S. 529, 541 (1991) (plurality opn.).  Changes in law generally do not apply retroactively to civil cases unless those cases are "on direct review or [] not yet final."  *United States v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal. 90265*, 51 F.3d 1402, 1406 (9th Cir. 1995) (citing *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 96–97 (1993)).  If the time for the Cities to challenge their permits has passed, then that is the end of it.  If the Cities' permit challenges are still pending, then they still have the opportunity to raise *CCSF II* as a defense.  Either way, there is no due process violation.

The Court **DENIES** the Cities' motion for leave to amend.[8]

### C.    Effect on the Scope of Trial

When the Court issued its earlier order setting the scope of trial, it held that evidence of the Cities' conduct under the 2022 Permit was admissible at least because such evidence was relevant to the Cities' defense that Baykeeper's request for injunctive relief is moot.  ECF No. 270 at 4–6.  The Court left open, however, the broader question of the scope of Baykeeper's claims.  Having now denied Baykeeper's motion for leave to amend, the Court resolves that question.

As the Court explained in its earlier order, the complaint sets the scope of the action as to the conduct being challenged and relief available.  *See Echlin v. PeaceHealth*, 887 F.3d 967, 977 (9th Cir. 2018) (citation omitted); Fed. R. Civ. P. 8(a)(3).  Here, the conduct being challenged has not changed from the 2015 Permit to the 2022 Permit.  Likewise, the Cities have been on notice that Baykeeper is seeking injunctive relief, which is forward-looking and therefore would necessarily cover future permits.  *See Nat. Res. Def. Council v. Cnty. of L.A.*, 840 F.3d 1098, 1103 (9th Cir. 2016) (courts may still issue injunctive relief after a new NPDES permit is issued).  Accordingly, Baykeeper's complaints fairly encompass injunctive relief for violations of the 2022 Permit.

---

[8] At the pretrial conference, the Cities raised the possibility of moving to stay this case pending further state proceedings related to *CCSF II*.  The Court is strongly inclined to deny any request for a stay at this time.  Trial is less than a week away.  The parties, their attorneys, and witnesses have already cleared their schedules to accommodate trial.  And this case has been pending for long enough.  If an adverse judgment is entered against the Cities following the conclusion of trial, the Court will consider whether a request to stay execution of judgment is appropriate then.

The situation is different for civil penalties. Unlike injunctive relief, civil penalties are not a form of prospective relief. A defendant facing civil penalties is therefore not inherently on notice of the risk of civil penalties for violations of future permits in the same way it is on notice of potential injunctive relief for such violations. The operative complaints in this case do not mention the 2022 Permit, so the complaints did not place the Cities on notice that they could face civil penalties for violations of the 2022 Permit. Even though the alleged misconduct does not change from the 2015 Permit to the 2022 Permit—meaning that the Cities are well-prepared to dispute violations under the 2022 Permit—the failure of the complaints to give notice is not harmless. The Cities have reasonably litigated this case expecting that their monetary liability would be limited to violations of the 2015 Permit at most. This has likely shaped their litigation strategy, including how to approach settlement, allocate resources, and frame their arguments. Drastically expanding the Cities' potential liability on the eve of trial would be unfair.

To be clear, the Court does not hold that the Clean Water Act's 60-day notice provision bars civil penalties under the 2022 Permit. Rather, it holds that civil penalties under the 2022 Permit are not available because Baykeeper's complaints do not provide adequate notice of such penalties as a remedy under Rule 8(a)(3).

The Clean Water Act requires 60-day notice for two reasons: (1) to allow government entities the chance to step in and enforce their environmental regulations; and (2) to give the alleged violator a chance to comply with the environmental laws before expensive litigation commences. *ONRC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137, 1143 (9th Cir. 2002) (citing *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989)). To achieve these purposes, the 60-day notice must describe what the defendant is allegedly doing wrong, *i.e.*, the conduct that constitutes or causes violations of the Clean Water Act. *See id.*; *Cottonwood*, 86 F.4th at 1264 (quoting 40 C.F.R. § 135.3(a)). The notice is not required to describe "every ramification of a violation," *i.e.*, the remedies or penalties that the defendant may face. *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) (quoting *Pub. Int. Rsch. Grp. v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995)); *Nw. Env't Advocs. v. U.S. EPA*, 745 F. Supp. 3d 1150, 1176 (D. Or. 2024) (same). Consequently, the scope of available remedies is

1    separate and independent from the 60-day notice.  *See Nat. Res. Def. Council v. Sw. Marine, Inc.*,

2    236 F.3d 985, 997 (9th Cir. 2000) (treating the question of remedies as different than questions

3    about the sufficiency of a 60-day notice).

4        It is Rule 8(a)(3) that governs the availability of remedies.  This Rule requires a plaintiff to

5    make "a demand for the relief sought" in its complaint.  Fed. R. Civ. P. 8(a)(3).  Meanwhile, "[t]he

6    scope of litigation is framed by the complaint."  *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*,

7    750 F.2d 731, 739 (9th Cir. 1984).  Taken together, these two principles restrict plaintiffs to

8    pursuing the remedies identified in their operative complaints.  For the reasons above,

9    Baykeeper's operative complaints sufficiently encompass injunctive relief under the 2022 Permit,

10    but not civil penalties under that Permit.  Accordingly, the trial will be limited to civil penalties for

11    violations of the 2015 Permit and injunctive relief for violations of the 2022 Permit.

12    **III.    STANDING**

13        In the parties' joint pretrial conference statement, the Cities also raised the possibility that

14    they would challenge Baykeeper's standing to allege violations of two different water quality

15    standards: REC-1 (dealing with water contact recreation) and REC-2 (dealing with non-contact

16    recreation).  Pretrial Statement at 7.  Because the Court had not clearly addressed the question of

17    whether REC-1 and REC-2 required separate standing, the Court ordered the parties to submit

18    briefs on the issue.  ECF No. 315.  The parties did so.  ECF Nos. 326, 328.

19        The Cities' standing objection appears to center around Article III's injury-in-fact and

20    traceability requirements.  But before delving fully into the standing issue, it bears taking a step

21    back to understand how REC-1 and REC-2 fit into this case.  The relevant claim that Baykeeper

22    has alleged on this issue is for violation of Limitation B.2.  That Limitation prohibits the Cities

23    from "caus[ing] or contribut[ing] to a violation of any applicable water quality standard."  2015

24    Permit § B.2.  REC-1 and REC-2 are such "applicable water quality standards."  That is, REC-1

25    and REC-2 represent different types of violations that fall under the same claim.

26        "[S]tanding is not dispensed in gross," so a plaintiff "must demonstrate standing separately

27    for each form of relief sought" as well as "for each claim he seeks to press."  *DaimlerChrysler*

28    *Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006) (citations omitted).  Put differently, courts assess

United States District Court
Northern District of California

1    standing on a claim-by-claim and remedy-by-remedy basis.  The Court is aware of no precedent,

2    however, that requires standing analysis to be conducted on a violation-by-violation basis when

3    each violation is part of the same claim.  And the Court doubts that such an analysis is required.

4    *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 325 (Davis, J.,

5    concurring)[9] (explaining that a violation-by-violation approach to standing is inconsistent with

6    Article III).

7          Still, the Court need not seek a definitive answer on the necessity of violation-by-violation

8    standing analysis here.  Even undertaking such an analysis, Baykeeper has standing to raise

9    violations of both REC-1 and REC-2 standards.  On summary judgment, the Court held that

10   Baykeeper had standing.  MSJ Order at 17, ECF No. 139.  In reaching this conclusion, the Court

11   rejected the Cities' argument that Baykeeper had not connected its members' injuries to a REC-2

12   violation.  *Id.* at 11.  The Court rejected that argument because "[Baykeeper's] motion focuses on

13   violations of the REC-1 standards," implicitly holding that Baykeeper's injuries were connected to

14   REC-1.  *Id.*  Summary judgment therefore resolved the question of REC-1 standing in the

15   affirmative.  But if there were any doubt, the Court expressly reaffirms its holding now.

16   Baykeeper's members testified that they avoided water contact because they were worried about

17   pollution.  Leong Decl. ¶ 14, ECF No. 81-4; TeBrake Decl. ¶ 17, ECF No. 81-5.  Since REC-1

18   standards are designed to protect water contact recreation, those members' inability to participate

19   in such recreation due to fears about pollution are injuries traceable to REC-1 violations.  *See*

20   *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 832 (9th Cir. 2021).  That is

21   sufficient for standing.

22          Baykeeper also has standing to raise REC-2 violations.  The REC-2 water standards are

23   aimed in part towards the preservation of "sightseeing, or aesthetic enjoyment."  ECF No. 101-1,

24   Ex. 40 § 2.1.16.  The Court's summary judgment order expressly found Baykeeper had established

25   that its members' aesthetic interests were harmed.  MSJ Order at 9–13.

26

27   [9] The Fifth Circuit voted to hear this case en banc.  But no position was ultimately able to garner a
     majority of the en banc court, so the en banc court summarily affirmed the district court without

28   addressing any merits issues.  *ExxonMobil*, 123 F.4th at 390 (Oldham, J., dissenting).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Accordingly, Baykeeper has standing to raise both violations of REC-1 and REC-2 water

2    quality standards.

3    **IV.    OBJECTIONS TO LATE-DISCLOSED WITNESSES**

4        What remains is the Cities' objection to three of Baykeeper's witnesses from three labs

5    that Baykeeper used to conduct water quality testing.  The Cities assert that Baykeeper did not

6    disclose these witnesses under Federal Rule of Civil Procedure 26(a), so the witnesses must be

7    excluded as a sanction under Federal Rule of Civil Procedure 37(c)(1).  The Court disagrees.

8        The essential purpose of Rule 26(a)'s disclosure requirements is "to 'accelerate the

9    exchange of basic information' that is 'needed in most cases to prepare for trial or make an

10   informed decision about settlement.'"  *City & Cnty. of S.F. v. Tutor-Saliba Corp.*, 218 F.R.D. 219,

11   221 (quoting Fed. R. Civ. P. 26(a) advisory committee's note to 1993 amendment).  To that end,

12   courts apply Rule 26(a)'s disclosure requirements "with common sense . . . , keeping in mind the

13   salutary purposes that the rule is intended to accomplish."  *Sender v. Mann*, 225 F.R.D. 645, 650

14   (D. Colo. 2004) (quoting Fed. R. Civ. P. 26(a) advisory committee's note to 1993 amendment).

15       Based on these principles, the Court concludes that Baykeeper did not sufficiently disclose

16   its three lab witnesses in its initial Rule 26 disclosures.  There is no dispute that Baykeeper did not

17   specifically name the three lab witnesses even though Rule 26(a) requires the disclosure of "the

18   name . . . of each individual likely to have discoverable information . . . that the disclosing party

19   may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A)(i).  Since this case is about

20   water quality, it is obvious that water quality tests would play a large role.  Witnesses from the

21   labs conducting these water quality tests would therefore likely have relevant, discoverable

22   information and should have been disclosed.

23       Baykeeper argues that, even though it did not specifically name any lab witnesses, it

24   implicitly disclosed those witnesses.  Baykeeper observes that it produced the test results from

25   each of the three labs at issue (along with other documents) at the same time that it served its

26   initial disclosures.  6/2 Maharg Decl. ¶ 5, ECF No. 339.  Then, Baykeeper cross-referenced those

27   documents in its initial disclosures:

28

1

2

3

4

> Baykeeper also refers Defendants to the documents produced contemporaneously with these written disclosures, which may include additional names and some contact information for individuals that may have information regarding Baykeeper's claims. Individuals named in a particular document may have information on the subjects to which that document refers.

5    ECF No. 331-2 at 2.  From Baykeeper's perspective, this was a sufficient disclosure under the

6    following chain of events: (1) the initial disclosures refer the Cities to Baykeeper's document

7    production; (2) the test results are in the document production, so the Cities were on notice of the

8    test results; (3) the test results identify the labs, so the Cities were on notice of the labs; and (4)

9    having notice of the labs, the Cities could have inquired about relevant witnesses at those labs.

10        This attenuated chain of events puts the onus on the Cities to identify potentially relevant

11   witnesses while Rule 26 puts that onus on Baykeeper.  It is also significantly less efficient than

12   requiring Baykeeper to identify the labs it used and a witness from each lab.  And perhaps most

13   importantly, ratifying disclosure via document production encourages parties to "indulge in

14   gamesmanship with respect to [their] disclosure obligations." Fed. R. Civ. P. 26(a) advisory

15   committee's note to 1993 amendment.  Although there is no reason to believe that Baykeeper

16   engaged in any gamesmanship here, it is easy to imagine a less scrupulous party in some other

17   case burying relevant witnesses in thousands of pages of documents and then proclaiming that it

18   met its obligations because it referenced those thousands of pages.  Thus, Baykeeper's disclosure

19   was inadequate under Rule 26.

20        In the specific circumstances here, however, that insufficiency is harmless under Rule 37

21   and therefore does not require exclusion. Fed. R. Civ. P. 37(c)(1).  Baykeeper intends to offer the

22   three lab witnesses for a very limited purpose—to authenticate the water quality testing results that

23   Baykeeper's experts use.  The Cities have raised no doubts about those results' authenticity either

24   in their written briefing or during oral argument at the pretrial conference.  So, allowing the lab

25   witnesses to testify on authenticity will not place the Cities in an unfairly disadvantageous

26   position.

27        As such, the Court **OVERRULES** the Cities' objections.  However, it limits Baykeeper's

28   direct-examination of the three witnesses to testimony authenticating the water quality test results.

This does not limit the scope of the Cities' cross-examination in any way.  But should the Cities pursue lines of questioning on cross-examination that exceed the scope of Baykeeper's direct-examination, Baykeeper may be permitted to redirect those lab witnesses to the full extent allowed by the Rules of Evidence.

## V.    CONCLUSION

In summary, the Court rules as follows:

- The Cities' MIL No. 1 (ECF No. 285) is **DENIED**;
- The Cities' MIL No. 2 (ECF No. 286) is **DENIED**;
- The Cities' MIL No. 3 (ECF No. 288) is **DENIED** without prejudice;
- The Cities' MIL No. 4 (ECF No. 290) is **DENIED**;
- Baykeeper's MIL No. 1 (ECF No. 301) is **GRANTED IN PART** and **DENIED IN PART**;
- Baykeeper's MIL No. 2 (ECF No. 302) is **GRANTED IN PART** and **DENIED IN PART**;
- Baykeeper's MIL No. 3 (ECF No. 321) is **DENIED**;
- Baykeeper's Motion to Amend (ECF No. 320) is **DENIED**;
- The Cities' Motion to Amend (ECF No. 324) is **DENIED**;
- Baykeeper has standing to raise violations of both REC-1 and REC-2 water quality standards;
- The Cities' objections to late disclosed witnesses (ECF No. 331) are **OVERRULED**.

**IT IS SO ORDERED.**

Dated:  June 6, 2025

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California