MELISSA A. THORME, Bar No. 151278
melissa.thorme@stoel.com
ANDREW D. PEREZ, Bar No. 348645
andrew.perez@stoel.com
STOEL RIVES LLP
500 Capitol Mall, Suite 1600
Sacramento, CA 95814
Telephone: 916.447.0700

*Attorneys for Defendants*
*CITY OF SUNNYVALE and CITY OF MOUNTAIN VIEW*

REBECCA MOON, City Attorney, Bar No. 167981
rmoon@sunnyvale.ca.gov
CITY OF SUNNYVALE
456 West Olive Avenue
Sunnyvale, CA 94086
Telephone: 408.730.7464

*Attorneys for Defendant*
*CITY OF SUNNYVALE*

JENNIFER LOGUE, City Attorney, Bar No. 241910
jennifer.logue@mountainview.gov
DAVID S. WILGUS, Sr. Ass't City Attorney, Bar No. 219181
david.wilgus@mountainview.gov
CITY OF MOUNTAIN VIEW
500 Castro Street
Mountain View, CA 94041
Telephone: 650.903.6303

*Attorneys for Defendant*
*CITY OF MOUNTAIN VIEW*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SUNNYVALE, a municipality,<br><br>Defendant,<br><br>and<br><br>CITY OF MOUNTAIN VIEW, a municipality,<br><br>Defendant. | Case No. 5:20-cv-00824-EJD<br>*(Cons. with Case No. 5:20-cv-00826-EJD)*<br><br>**DEFENDANTS CITY OF SUNNYVALE AND CITY OF MOUNTAIN VIEW'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION**<br><br>Dept.: Courtroom 4<br>Judge: Honorable Edward J. Davila<br><br>Case Filed: February 4, 2020<br>Trial Dates: June 10-July 9, 2025 |

## TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ..... ii

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 1

A. A Permanent Injunction Is Not Warranted ..... 1

1. Baykeeper Has Demonstrated No Irreparable Injury ..... 3

2. The Standards Are Different for Standing and Injunctive Relief ..... 6

3. Legal Remedies Exist That Could Eliminate Any Future Harm or "Violations." ..... 7

4. The Balance of Hardships Does Not Support Injunctive Relief ..... 9

5. A Permanent Injunction Would Not Serve the Public Interest ..... 10

B. Baykeeper's Proposed Injunction Is Far Too Broad and Infeasible ..... 11

1. No Injunction Is Warranted to Implement Provision B.2 as Wholly Past ..... 11

2. No Water Quality Component Exists in Provision A.1's "Effective Prohibition." ..... 16

3. Critique of Baykeeper's Proposed Injunctive Terms ..... 18

a. Source Identification and Elimination with Special Studies ..... 18

b. Dry Weather Discharge Elimination ..... 20

c. Comprehensive Plan to Reduce Bacteria in Stormwater ..... 21

d. Ongoing Monitoring to Confirm Compliance ..... 22

e. Final Compliance Deadline ..... 22

f. Reporting Requirements ..... 23

4. Twenty Years of Oversight and Compliance Payments Are Unnecessary.. ..... 23

C. Any Injunctive Relief Should Be Deferred So That the Regional Board Can Decide What Is Needed for Future Compliance ..... 24

D. An Evidentiary Hearing Is Required Prior to Issuing a Permanent Injunction ..... 25

III. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**


*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987) .................... 5, 6

*Apple Inc. v. Psystar Corp.*,
658 F.3d 1150 .................... 7

*Atl. States Leg. Found., Inc. v. Eastman Kodak Co.*,
933 F.2d 124 (2d Cir. 1991) .................... 13

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) .................... 2

*Bayer v. Neiman Marcus Grp., Inc.*
861 F.3d 853 (9th Cir. 2017) .................... 14

*Carr v. Alta Verde Indus., Inc.*,
931 F.2d 1055 (5th Cir. 1991) .................... 11, 12

*Charlton v. Est. of Charlton*,
841 F.2d 988 (9th Cir. 1988) .................... 25

*City & County of San Francisco v. EPA*,
604 U.S. 334 (2025) .................... 8, 21

*Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC*,
158 F.4th 1052 (9th Cir. 2025) (*Naples*) .................... 2, 6, 13, 14

*Comfort Lake Ass'n v. Dresel Contracting, Inc.*,
138 F.3d 351 (8th Cir. 1998) .................... 13

*DeFunis v. Odegaard*,
416 U.S. 312 (1974) .................... 11, 12

*Earth Island Institute v. Southern California Edison Co.*,
92 F.Supp.2d 1060 (S.D. Cal. 2000) .................... 23

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) (Roberts, C.J., concurring) .................... 1, 3, 6, 10

*Env't Conservation Org. v. City of Dallas*,
529 F.3d 519 (5th Cir. 2008) (*ECO*) .................... 12, 13, 14, 15

*Forest Conservation Council v. U.S. Forest Serv.*,
66 F.3d 1489 (9th Cir. 1995) .................... 5

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 5, 12

*Galvez v. Jaddou*,
52 F.4th 821 (9th Cir. 2022) .......... 7

*Geertson Seed Farms v. Johanns*,
570 F.3d 1130 (9th Cir. 2009) (*Geertson*), *rev'd and remanded, Monsanto*, 561 U.S. 139 (2010) .......... 3, 10

*Gonzalez v. U.S. Immigr. & Customs Enf't*,
975 F.3d 788 (9th Cir. 2020) .......... 6

*Greater Yellowstone Coal. v. Larson*,
641 F.Supp.2d 1120 (D. Idaho 2009) .......... 14

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) (Scalia, J., concurring) .......... *passim*

*Idaho Watersheds Project v. Hahn*,
307 F.3d 815 (9th Cir. 2002), *abrogated on other grounds, Monsanto*, 561 U.S. 139 (2010) .......... 24, 25

*Int'l Refugee Assistance Project v. Trump*,
883 F.3d 233 (4th Cir.) .......... 5

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) (en banc) .......... 3

*Locke v. Bd. of Pub. Instruction of Palm Beach Cnty.*,
499 F.2d 359 (5th Cir. 1974) .......... 12

*Martin v. Franklin Cap. Corp.*,
546 U.S. 132 (2005) .......... 1

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......... 3, 9

*N.Y. Coastal Fishermen's Ass'n v. N.Y.C. Dep't of Sanitation*,
772 F.Supp. 162 (S.D.N.Y. 1991) .......... 15

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
241 F.3d 722 (9th Cir. 2001) .......... 5

*Nat'l Wildlife Fed'n v. Hanson*,
859 F.2d 313 (4th Cir. 1988) .......... 13

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) (*NWF*) .......... 5

*Northcoast Env't Ctr. v. Glickman*,
136 F.3d 660 (9th Cir. 1998)........ 24

*NRDC v. Cnty. of Los Angeles*,
673 F.3d. 880 (9th Cir. 2011), *rev'd on other grounds sub nom. L.A. Cnty. Flood Control Dist. v. NRDC*, 568 U.S. 78 (2013)........ 4

*NRDC v. Cnty of Los Angeles*,
725 F.3d 1194 (2013), *cert. denied*, *L.A. Cnty. Flood Control Dist. v. NRDC*, 572 U.S. 1100 (2014)........ 4

*Or. Nat. Res. Council, Inc. v. Grossarth*,
979 F.2d 1377 (9th Cir. 1992)........ 12

*Rapanos v. United States*,
547 U.S. 715 (2006) (plurality opinion of Scalia, J.)........ 7

*Rogue Advocs. v. Mountain View Paving, Inc.*,
No. 1:15-CV-01854-CL, 2016 WL 6775636 (D. Or. Nov. 15, 2016)........ 13

*Rsrv. Mining Co. v. EPA*,
514 F.2d 492 (8th Cir. 1975)........ 15

*Sackett v. EPA*,
598 U.S. 651 (2023)........ 7

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)........ 2

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)........ 3

*TIG Ins. Co. v. Sedgwick James of Wash.*,
276 F.3d 754 (5th Cir. 2002)........ 14

*United States v. Cumberland Farms of Conn., Inc.*,
826 F.2d 1151 (1st Cir. 1987)........ 11

*United States v. Deaton*,
332 F.3d 698 (4th Cir. 2003)........ 11

*United States v. Or. State Med. Soc.*,
343 U.S. 326 (1952)........ 12

*United States v. Sexton Cove Ests., Inc.*,
526 F.2d 1293 (5th Cir. 1976)........ 11

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953)........ 13

*Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213 (3d Cir. 2025) ..... 5

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ..... 5, 15

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), *vacated on other grounds*, 585 U.S. 1028 (2018) ..... 5

*Yazzie v. Hobbs*, 977 F.3d 964 (9th Cir. 2020) ..... 6

**California Cases**

*Cal. Ass'n of Sanitation Agencies v. State Water Res. Control Bd.*, 208 Cal.App.4th 1438 (2012) ..... 8

**Other State Cases**

*Nw. Env't Advocs. v. DEQ*, 349 Or.App. 17 (2026) ..... 8

**Federal Statutes**

33 U.S.C. § 1313(b), (c) ..... 19

33 U.S.C. § 1313(d) ..... 10, 23

33 U.S.C. § 1319(a) ..... 2

33 U.S.C. § 1319(b) ..... 2

33 U.S.C. § 1319(d) ..... 1

33 U.S.C. § 1342 ..... 2

33 U.S.C. § 1362(12) ..... 18

33 U.S.C. § 1362(14) ..... 18

33 U.S.C. § 1365(a) ..... 1, 2

33 U.S.C. § 1365(f)(7) ..... 2

Clean Water Act ..... *passim*

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 65 ..... 25

**Federal Regulations**

40 C.F.R. §122.26(b)(2) ........ 16

40 C.F.R. §122.26(b)(13) ........ 16

40 C.F.R. §122.44(a)(1) ........ 17

40 C.F.R. §122.44(d)(1) ........ 17

40 C.F.R. §122.47 ........ 9

40 C.F.R. §122.47(a) ........ 7

90 FR 52498 (2025) ........ 7

**Constitutional Provisions**

U.S. Const., art. III ........ 2, 6

**Other Authorities**

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2942 (2d ed. 1990) ........ 15

https://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/TMDLs/sfbaybeachesbacteria/arp2026/Draft_Staff_Report.pdf ........ 10

Precedential Order No. WQ 2015-0075 ........ 8

Regional Board Order No. R2-2015-0049 ........ 2

Regional Board Order No. R2-2022-0018 ........ 2

S. Rep. No. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668 ........ 13

## I. INTRODUCTION

Defendants City of Sunnyvale (Sunnyvale) and City of Mountain View (Mountain View) (the Cities) respectfully request that this Court deny injunctive relief, not by excusing non-compliance, but by holding that, on this record, Plaintiff San Francisco Baykeeper (Baykeeper) has not shown that an injunction is warranted and would prevent any concrete or irreparable injury. This denial would preserve the Court's merits rulings, avoid undercutting the rigorous programs overseen by regulatory agencies tasked with making hard decisions about appropriate pathways and timelines for compliance, and ensure all regulated entities are treated fairly and equally under the law,[1] particularly since the record shows that fecal indicator bacteria (FIB) is ubiquitous in urban receiving waters and not unique to the two creeks in these two Cities. Thus, the Cities request that Baykeeper's Motion for Permanent Injunction (ECF 420) be denied for the following reasons.

## II. ARGUMENT

### A. <u>A Permanent Injunction Is Not Warranted.</u>

Even after the Court's rulings on liability as set forth in its Findings of Fact and Conclusions of Law (ECF 417, as modified (FFCL)), a permanent injunction remains discretionary at best and is not automatic under the Clean Water Act (CWA), which only provides *limited jurisdiction* to federal district courts. The CWA provides the authority "without regard to the amount in controversy or the citizenship of the parties, <u>to enforce such an effluent standard or limitation</u>, or such an order, or to order the Administrator to perform such act or duty, as the case may be, <u>and to apply any appropriate civil penalties under section 1319(d) of this title</u>."[2] (33 U.S.C. §1365(a)

---

[1] "Discretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike." (*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006) (*eBay*) (Roberts, C.J., concurring) (quoting *Martin v. Franklin Cap. Corp*., 546 U.S. 132, 139 (2005)).) The Cities should not be treated more harshly than others.

[2] The Cities raised the issue of the inappropriateness of civil penalties under Section 1319(d) in post-trial briefing and earlier in this case. (*See* ECF 414 at 25:7-15; *see also* ECF 409 at 40:10-17 & 26:13-27:4; ECF 29 at 23:4-24:17 [motion to dismiss (MTD) arguing civil penalties and

(emphases added).) The CWA merely authorizes district courts to enforce an "effluent standard or limitation," which is defined in pertinent part as "a permit or condition of a permit issued under section 1342 of this title that is *in effect* under this chapter."[3] (*Id.* §1365(a), (f)(7) (emphasis added).)

Compare the above citizen suit authorization language to the much broader and much more specific language contained in CWA section 1319(b), which states:

> The Administrator is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section. Any action under this subsection may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such action shall be given immediately to the appropriate State. (*Id.,* §1319(b) (emphases added).)

CWA section 1319(b) clearly and specifically authorizes permanent injunctive relief and provides express jurisdiction for restraining violations and requiring compliance in civil enforcement actions *brought by EPA*. (*Id.*) The CWA's *citizen* enforcement provisions clearly lack this same specificity. (*Id.* §1365(a); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 439-40, 452 (2002) [when Congress includes particular language in one section of a statute but omits it in

---

injunctive relief inappropriate]; ECF 143-1 at 18:22-22:24 [MTD arguing same for "wholly past" violations].) The Cities incorporate by reference those arguments here to allow Baykeeper to respond (FFCL at 45, n.22). Additionally, since that briefing, the Ninth Circuit has confirmed civil penalties are not appropriate for past violations. "Restricting civil penalties to only cases where they may deter future violations ensures both compliance with Article III and the Act." (*Coastal Env't Rts. Found. v. Naples Rest. Grp., LLC*, 158 F.4th 1052, 1063 (9th Cir. 2025) (*Naples*) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.* (*Gwaltney*), 484 U.S. 49, 70 (1987) (Scalia, J., concurring)); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106-07 (1998).)

[3] The 2015 Permit, Order No. R2-2015-0049 (ECF 395-1) for which liability was imposed in the FFCL, was *rescinded* and thus was no longer "in effect" upon adoption of the 2022 Permit, Order No. R2-2022-0018. (ECF 395-2 at 9.)

another of the same Act, it is presumed that Congress acted intentionally and purposefully].)

**1. Baykeeper Has Demonstrated No Irreparable Injury.**

Even if permanent injunctive relief was deemed available for CWA citizen suits, the Supreme Court has made it clear that statutory authorization does not displace the weighing of equitable principles, including sufficient proof of irreparable harm and inadequacy of legal remedies. (*See eBay*, 547 U.S. at 394.) The reasoning in *eBay* has been applied in broader contexts, including environmental and regulatory disputes. For instance, the United States Supreme Court affirmed the four-factor test to an environmental injunction, emphasizing that irreparable harm cannot be presumed and must be demonstrated. (*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-157 (2010) (*Monsanto*); *see also Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ["Our law does not, however, allow us to abandon a balance of harms analysis just because a potential environmental injury is at issue."].)

In balancing the equitable factors, the Ninth Circuit confirmed a finding of irreparable environmental harm in a case where alfalfa contamination at issue could not be reversed. (*Geertson Seed Farms v. Johanns*, 570 F.3d 1130, 1138 (9th Cir. 2009) (*Geertson*), *rev'd and remanded by Monsanto*, 561 U.S. at 156.) In contrast, FIB is highly variable in nature. (Trial Transcript ("TT") 349:16-21 [Wren confirming Baykeeper FIB data is highly variable], 1438:7-8 [Steets stating FIB is "one of the most variable pollutants in water quality"]; ECF 402-10 at 30 ["Extensive sampling required to account for variable results."], 74 ["concentrations are highly variable, typically spanning an order of magnitude or more"].) Thus, FIB levels could become compliant, particularly if regulatory relief were granted. (*See infra* Section II.A.3.)

Furthermore, the Supreme Court has repeatedly *rejected* the idea that bare statutory violations, divorced from real-world effects, suffice for equitable relief. (*See Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009).)

Here, despite not having enough data to legally compare sampling results to the applicable water quality objective, the Court found that the Cities violated the *E. Coli* criteria (FFCL 13:14-

18, 15:9-11),[4] which were set to protect full-contact body recreation (or REC-1 use, where the whole body or face is submerged and water can be readily ingested). (ECF 407-7 at 11.) However, the evidence also shows that over three recent years of creek walks and other reconnaissance, the Cities found ***no one*** engaged in full-contact recreation *in* Stevens Creek or Calabazas Creek. (TT 1094:20-25 [Sandahl never observed anyone recreating in the water]; *see also* ECF 396-2 at 14, 19 [Mid-Interpretative Report describing lack of REC-1 use].) While evidence showed people riding bikes or walking along the creek (TT 735:18-736:21) (i.e., a REC-2 use where a different standard applies (ECF 407-7 at 11)), the evidence also showed it is unlikely that anyone would or could recreate in these waters even if they were pristine because of the difficulty of and limited access in many areas (ECF 406-10 at 2-7), the existence of dangerous obstructions, the low or no flow in times of year when recreation would be likely (ECF 396-2 at 8), and the hazardous high flows in rain events. (TT 224:14-225:9, 226:15-23, 227:3-11, 230:8-231:1, 1406:13-22.) Thus, no realistic pathway exists for full-body contact human exposure that could cause any human health impact or injury. Because the applicable FIB standard is solely set for human health protection, this fact must be carefully considered because an injunction sets *forward-looking* relief that requires a real

---

[4] Compliance with the Basin Plan objectives can only be determined "[b]ased on the minimum of five consecutive samples equally spaced over a 30-day period." (TT 1302:1-11 [Lichten].) Although Baykeeper in 2017-2019 took multiple samples per month, all receiving water data after 2019 were single day samples, inadequate for comparison to the standard, which requires at least 5 samples in a 30-day period. (ECF 407-7 at 349 [SF Basin Plan Table 3-1]; ECF 400-7 at 3-6 [post-February 2019 data]; ECF 286 [Cities' brief regarding post-February 2019 data]; ECF 409 at 37:12-38:16; TT 1511:10-13.) Outfall data alone cannot be used for compliance because the FIB standard is not a permit effluent limitation and contemporaneous data was not taken in the receiving water. (TT 1677:11-22; *see NRDC v. Cnty. of Los Angeles*, 673 F.3d. 880, 901 (9th Cir. 2011) [requiring paired data to demonstrate cause and contribution], *rev'd on other grounds sub nom. L.A. Cnty. Flood Control Dist. v. NRDC*, 568 U.S. 78 (2013), *modif'd by NRDC v. Cnty of Los Angeles*, 725 F.3d 1194 (2013), *cert. denied*, *L.A. Cnty. Flood Control Dist. v. NRDC*, 572 U.S. 1100 (2014).)

likelihood of future injury.

Irreparable harm requires more than a showing of regulatory non-compliance. (*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 544-45 (1987) [irreparable harm not presumed by agency's failure to comply with environmental regulations because injunctive relief is an equitable remedy requiring balancing of factors]; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 319 (1982) [violations of CWA and other federal statutes "have not automatically led courts to issue injunctions"].) In *Amoco,* the Supreme Court held that an injunction had not been properly ordered because injury was "not at all probable." (480 U.S. at 545.) The Ninth Circuit has also recognized that even when a district court finds that a statutory violation occurred, "an injunction may be withheld." (*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 n.18 (9th Cir. 2001) (citing *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995)); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (*NWF*) [no presumption of irreparable injury for violations of Endangered Species Act].)

"Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm absent an injunction." (*NWF*, 886 F.3d at 822 (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (*Winter*)); *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) [for standing purposes, plaintiff must show "injury to the plaintiff" rather than "injury to the environment"].) "The Supreme Court has held that the irreparable harm must be 'likely,' not merely possible." (*Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir.) (quoting *Winter*, 555 U.S. at 22), *vacated on other grounds*, 585 U.S. 1028 (2018); *NWF*, 886 F.3d at 818 ["A 'possibility' of irreparable harm cannot support an injunction." (citation omitted)].) Likely means more likely than not. (*See Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 218 (3d Cir. 2025).) The evidence does not support a finding that Baykeeper will, more likely than not, suffer irreparable injury if an injunction is not issued. Baykeeper offered only one witness, Elizabeth Tebrake, who testified that she rides bikes along the creeks. (TT at 729:8-730:21.) Baykeeper has submitted no other declarations, expert testimony, or evidence that irreparable injury is "likely" to occur. This Court should therefore reject the requested injunction because the chain of causation from violation to

exposure to injury is purely theoretical. (*See Winter,* 555 U.S. at 21 ["[P]laintiffs must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief."].) Baykeeper may have proven a *numerical exceedance*, but not a viable *human risk*. (TT 1538:20-23 [Steets].) Without evidence of full-body recreational use or actual injury, such as confirmed gastrointestinal illness after swimming, the violation is abstract at best, not irreparable. For these reasons, Baykeeper has failed to demonstrate irreparable injury.

### 2. The Standards Are Different for Standing and Injunctive Relief.

Baykeeper's brief blurs the lines between requirements for standing and injunctions. (ECF 420 at 7:6-15.) However, these concepts differ. Standing ensures that the plaintiff has a sufficient stake in the controversy to invoke the court's jurisdiction, while the permanent injunction standard addresses whether equitable relief is warranted after the plaintiff prevails on the merits.

Standing represents a threshold, federal jurisdictional requirement under Article III, typically required before the court reaches the merits or equitable factors. (*Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020); *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 803 (9th Cir. 2020).) Standing does not imply or guarantee entitlement to equitable relief. Meeting the requirements for equitable relief is a separate, demanding four-factor test. (*eBay*, 547 U.S. at 391.) The Court must focus on a *forward-looking* equitable remedy only where a realistic possibility exists for future injury because past claims of injury alone are not enough to justify an injunction. (*Naples*, 158 F.4th at 1060.) Here, any Provision B.2 violations were not ongoing after the 2022 Permit was adopted (FFCL 41:18-19), so any injunctive relief must be narrowly tailored.

Ongoing violations are required for CWA standing (*Gwaltney*, 484 U.S. at 59), so a finding of past liability is not enough for an injunction. Finding violations does not automatically create "irreparable injury," especially where the violations found stretch the limits of the applicable standards (FFCL 14, ¶28 [finding data shows violations when not following the standard's requirements]) and where the protected interest (human health protection while swimming) is non-existent. (ECF 396-2 at 7-8.) As discussed above, the Ninth Circuit has been clear that equitable relief still requires proof, not just a statutory breach. (*Amoco*, 480 U.S. at 544-45.)

### 3. Legal Remedies Exist That Could Eliminate Any Future Harm or "Violations."

For injunctive relief to be warranted, remedies available at law, such as monetary damages, must be inadequate to compensate for the injury. (*Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1152-53 (9th Cir. 2011); *Galvez v. Jaddou*, 52 F.4th 821, 83 (9th Cir. 2022).) Because Baykeeper provided no evidence of actual injuries, compensation would not be required and thus cannot be deemed inadequate. Moreover, legal remedies exist that could transform the "violations" into compliance as discussed during briefing for this case or at trial. (ECF 143-1 at 21:10-22:24 ["[A] new permit can moot an action if, after its issuance, a basis exists for believing the permit makes future violations less likely, deterrence less necessary, and civil penalties less potent."].) )

For example, if the creeks at issue were determined *not* to be waters of the United States (WOTUS) due to new definitions and regulations, then the NPDES permit requirements would no longer apply to these waters. (*See* TT 1094:6-19 [Sandahl]; ECF 396-2 at 8, 11-13; ECF 406-10 [creek photographs]; *Sackett v. EPA*, 598 U.S. 651, 670-73 (2023) [WOTUS encompasses "only those relatively permanent, standing or continuously flowing bodies of water"].) The Cities provided previously unconsidered evidence at trial that Stevens and Calabazas Creeks only flow in direct relation to precipitation. (ECF 396-2 at 10-13; *see also Sackett*, 598 U.S. at 671; *Rapanos v. United States*, 547 U.S. 715, 739, 742 (2006) (plurality opinion of Scalia, J.).) Although the Court many times ruled that these creeks are WOTUS (*see* FFCL 2:7-11 & n.4), new federal rules are pending that might modify this stance. (90 Fed. Reg. 52498 (2025).) Consistent with the *Sackett* decision, ephemeral waters (i.e., those with surface water flowing or standing only in direct response to precipitation) are not jurisdictional because they are not relatively permanent. (*Id.* at 52517-52518.) The agencies are also considering limiting the definition of "relatively permanent waters" to only "perennial" waters. (*Id.* at 52519.) Either change could fundamentally modify the Court's characterization of these waterways.

Similarly, if site-specific objectives for FIB were adopted that reflect the reality of urban waterways or if compliance schedules were added/extended in the permit to allow time to come into compliance, the Cities would no longer be in violation. (ECF 395-4 at 2 [explaining "Regional

Board will consider modification of specific water quality objectives"]; 40 C.F.R. §122.47(a) [permits may include a schedule of compliance leading to CWA compliance].)

If the beneficial use of REC-1 were removed from the creeks at issue (TT 1292:9-15 [Lichten]), then the REC-1 *E. Coli* standard would no longer apply. Stevens Creek and Calabazas Creek were presumptively designated in the Basin Plan as having REC-1 beneficial uses, without supporting evidence. (*See* ECF 396-2 at 7 (citing SFBRWQCB 2024).) It is important to note that the REC-1 beneficial use designations for these surface waters were inferred and may be inaccurate. (*Id.*) "Where a [Regional Board] has evidence that a designated use does not exist and likely cannot be feasibly attained, <u>it is unreasonable to require a discharger to incur control costs to protect that use</u>." (*Cal. Ass'n of Sanitation Agencies v. State Water Res. Control Bd.*, 208 Cal.App.4th 1438, 1460, 1461 (2012) (brackets in original; citation omitted; emphasis added) [Moreover, "[i]f the Regional Board unreasonably fails" to initiate the basin plan amendment process where it "has evidence that a use neither exists nor likely can be feasibly attained," mandate will issue].)

The Cities produced evidence that "[n]o swimming beaches occur along these creeks and most reaches through the Cities of Sunnyvale and Mountain View are dry during the dry season (April – September) when body contact recreation would most likely occur and during dry periods of the wet season (October to March) when temperatures are often too cool for recreation." (ECF 396-2 at 7.) "Where flow is present in the summer, such as along limited segments of Stevens Creek, water depths are shallow providing little to no option for swimming and a low likelihood that water would be ingested (which is a prerequisite for REC-1 use)." (*Id.* at 8 [with photos].)

In addition, if the current 2022 Permit is modified in 2027 to remove the Receiving Water Limitations (RWLs) and Discharge Prohibitions as unlawful "end result" requirements per *City & County of San Francisco v. EPA*, 604 U.S. 334 (2025) (*CCSF*),[5] or if the "deemed in compliance" language of Provision C.1 is expanded to more explicitly cover Provision A.1 and continues to cover Provision B.2 for the Cities, then there would be no ongoing violations to enjoin. Thus,

---

[5] *See Nw. Env't Advocs. v. DEQ*, 349 Or.App. 17, 32 (2026) [removal of RWLs consistent with *CCSF* decision is not subject to federal anti-backsliding requirements].

numerous legal remedies exist to address the violations without extraordinary cost or infeasible tasks. (*See* ECF 409-2 [Cities' Appendix of Suppl. Auth. to Post Trial Brief, Ex. A (Precedential Order No. WQ 2015-0075)] at 48-50, 77, ¶6 [State Board held a "safe harbor" can exist in the planning process]; 40 C.F.R. §122.47 [rule authorizing compliance schedules]; TT 1292:22-1293:3 [Lichten] [2022 Permit contains bacteria compliance schedule]; TT 1685:9-1686:12.)

**4. The Balance of Hardships Does Not Support Injunctive Relief.**

Baykeeper's proposed injunction may create severe hardship to the Cities by requiring technologically infeasible controls, massive capital investment, and/or actions unrelated to any actual recreational use. Yet, Baykeeper itself will suffer no demonstrable hardship absent an injunction because no one, including their members, uses the creeks at issue for the protected purpose of full-body contact recreation, and no future exposure is likely to occur. (See *supra* 4:6-13.)

The cost and feasibility of the proposed actions have not been provided by Baykeeper, but if allowed to present additional evidence, the Cities could show that Baykeeper's proposals will be extraordinarily expensive and may not be feasible. (See *infra* Section II.D.)

Baykeeper claims that the Regional Board has "already determined that the cost of complying with NPDES permits generally and this MS4 [municipal separate storm sewer system] Permit specifically is outweighed by the benefits compliance creates." (ECF 420 at 9:1-2.) However, evidence at trial showed that the FIB standards cannot be met in urban stormwater. (TT 1524:17-25 [Steets: "We know that all land uses have high percent of samples above bacteria standards. We know that when you take deionized water, potable water out of a tap, and it has no bacteria in it and you pour it on a street gutter, and even before it enters the pipe network, it jumps over the standards."].) In fact, the 2022 Permit expressly determined that compliance with the FIB provisions Baykeeper seeks for this Court to enforce is *infeasible,* and specifically stated:

> Treatment of runoff to reduce fecal indicator bacteria levels below water quality objectives is <u>not feasible</u>. While some treatment systems that provide biofiltration and bioretention and/or capture runoff will reduce levels of bacteria in runoff discharges, reduction to levels below water quality objectives requires disinfection, as in municipal wastewater treatment systems. Disinfection of stormwater runoff is not feasible with episodic and variable runoff discharges, and if chlorine were to be used for disinfection, due to its high toxicity, a system would also have to include dichlorination, which is also <u>not feasible</u> for episodic and variable runoff discharges. (ECF 395-2 at 557 (emphases added); *see also* TT 1295:22-1296:6 [Lichten].)

This situation creates a profound asymmetry that the Court could rely on to deny the requested injunction given the unique facts. In *Geertson*, the Court was primarily concerned with economic harm to appellants in issuing a permanent injunction. (570 F.3d 1130, 1138, *rev'd and remanded by Monsanto*, 561 U.S. at 156.) That is very different from the situation here where the alleged harm to human health is theoretical at best.

**5. A Permanent Injunction Would Not Serve the Public Interest.**

The Supreme Court has held "that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity." (*eBay*, 547 U.S. at 394.)

Here, the public interest is not served by imposing costs with no guaranteed health or environmental gain. (TT 1449:4-20 [Steets discussing large costs for small treatment area]; TT 196:16-21 [Wren].) Because this injunction would only apply to the Cities and not to the other municipalities or dischargers that also contribute stormwater flow to the creeks at issue (namely, Santa Clara, Cupertino, and Los Altos), there is no way to ensure that the creeks could attain the concentration-based FIB standards even if the Cities stopped all stormwater and non-stormwater flows entirely. (ECF 91 at 11:8-23:22 [any alleged injury to Baykeeper is not traceable to the Cities or redressable due to the many contributions (and highly variable nature) of FIB to the waterways at issue].) Other ways exist to meet standards, such as BMPs set in an advance restoration plan (see https://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/TMDLs/sfbaybeachesbacteria/arp2026/Draft_Staff_Report.pdf) or a Total Maximum Daily Load (TMDL) (33 U.S.C. §1313(d).) However, these BMP-based bacteria controls are not nearly as stringent or detailed as what Baykeeper proposes. (*See* ECF 395-2 at 186-195 [Pacifica/San Mateo County], 195-198 [San Mateo Marina Lagoon Beaches], 198-202 [Half Moon Bay/San Mateo County].)

The public interest is not served by judicial micromanagement of technical water quality issues and science that is changing rapidly, or by skipping or ignoring regulatory agency prioritization in favor of litigation outcomes. The public interest is also not advanced by injunctions that produce no tangible environmental benefit. As the evidence showed, the FIB standard at issue is not set to protect the environment, but instead to protect human health in specific full-body

contact situations only. (TT 1406:15-22 [Steets], 112:23-113:2 [Wren].) Since bacteria is not visible (TT 1600:13-14 [Wren]) and no evidence was presented that it creates an odor or any environmental harm, the usual environmental protection justifications do not exist here.

In evaluating injunctive relief, the Court must consider whether the proposal: (1) "would confer maximum environmental benefits," (2) is "achievable as a practical matter," and (3) "bears 'an equitable relationship to the degree and kind of wrong it is intended to remedy.'" (*United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003) (quoting *United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1164 (1st Cir. 1987)); *see also United States v. Sexton Cove Ests., Inc.*, 526 F.2d 1293, 1301 (5th Cir. 1976).) Here, where limited if any environmental benefit will be conferred and the requested relief may not be practically achievable, the relationship of wrong to proposed remedy is not equitable.

Interestingly, Baykeeper claims that there is "no countervailing public interest in allowing continued violations of federal environmental law." (ECF 420 at 10:3-4.) However, this statement conveniently ignores the fact that these "violations" will also continue under Baykeeper's proposed injunctive relief for up to 20 years. The public interest is best served by allowing the Regional Board, the expert in this technical arena, to determine the best strategy for compliance in the next permit cycle, based on a full public comment period, not just the desires of Baykeeper.

### B. <u>Baykeeper's Proposed Injunction Is Far Too Broad and Infeasible.</u>

#### 1. No Injunction Is Warranted to Implement Provision B.2 as Wholly Past.

Baykeeper requests an injunction predominantly related to wet weather stormwater discharges causing or contributing to water quality exceedances, which all relate to Provision B.2. Baykeeper is not entitled to injunctive relief where no current violation of the 2022 Permit exists for Provision B.2. Baykeeper's claims were only for the 2015 Permit that is no longer in effect. (ECF 140 at 2; ECF 395-2 at 8, ¶20.) Most importantly, this Court held that "the Cities are not in violation of Limitation B.2 under the 2022 Permit because they satisfy the alternative path to compliance." (FFCL 41:16-17.) Thus, no injunction is needed to compel compliance with Provision B.2. (*DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974) ["A determination by this Court of the legal issues tendered by the parties is no longer necessary to compel that result[.]"].)

Moreover, developments after the filing of a citizen suit may moot all or part of a citizen's case. (*See Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061-65 (5th Cir. 1991).) One MS4 case explored such a situation where a plaintiff argued that the City must prove that a post complaint action "'actually stops all violations without any likelihood the violations will recur'" in order to have its citizen suit dismissed as moot. (*Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008) (*ECO*).) The test for mootness that ECO urged the court to apply was derived from cases where the defendant argued that its *voluntary conduct* mooted the plaintiff's suit. (*Id.* (citing *Friends of the Earth, Inc.,* 528 U.S. at 189 ["The only conceivable basis for a finding of mootness in this case is Laidlaw's voluntary conduct …."]); *Carr*, 931 F.2d at 1061-65 [cattle feedlot's voluntary improvements and application for CWA permit did not moot citizen suit].) But that stringent standard was only appropriate when considering *voluntary* cessations of CWA violations to "protect[] plaintiffs from defendants who seek to evade sanction by predictable 'protestations of repentance and reform.'" (*Gwaltney*, 484 U.S. at 67 (quoting *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952)).)

Federal courts have long recognized that allegations by a defendant that its voluntary conduct has mooted the plaintiff's case require closer examination than cases with allegations that "happenstance" or official acts of third parties have mooted the case. (*See DeFunis*, 416 U.S. at 316-20; *Locke v. Bd. of Pub. Instruction of Palm Beach Cnty.*, 499 F.2d 359, 363-64 (5th Cir. 1974); *see also Laidlaw*, 528 U.S. at 214 (Scalia, J., dissenting).)

For example, if the court in *ECO* had been considering an argument by the city that plaintiff's claims were moot because the city had *voluntarily* hired the requisite number of compliance and monitoring staff or *voluntarily* set aside funds for environmental projects, the court stated it would employ the standard discussed in *Laidlaw* and *Carr* because there would be no impediment to the city's laying off those new hires or reallocating the funds after ECO's suit was dismissed. (529 F.3d at 527.) But, the court in *ECO* found the city's compliance to be "[f]ar from voluntary," because the city's compliance with the terms of its MS4 Permit and the CWA has been compelled by an EPA enforcement action and the resulting court-approved consent decree. (*Id.* at 528; *see also Or. Nat. Res. Council, Inc. v. Grossarth*, 979 F.2d 1377, 1379 (9th Cir. 1992) [Forest

Service cancelation of a timber sale in response to the plaintiff's successful administrative appeal "was not a voluntary cessation within the meaning of that doctrine" and the plaintiff's suit was therefore moot]; *Rogue Advocs. v. Mountain View Paving, Inc.*, No. 1:15-CV-01854-CL, 2016 WL 6775636, at *7, *8, *13 (D. Or. Nov. 15, 2016) [relying on *Grossarth*, court dismissed Clean Air Act citizen suit as moot, because defendant's compliance, compelled by a state administrative order, was not "voluntary cessation"]; *Comfort Lake Ass'n v. Dresel Contracting, Inc.*, 138 F.3d 351, 355 (8th Cir. 1998) [state administrative order mooted CWA citizen suit].) Further, the actions that allegedly mooted ECO's suit were actions of third parties (the EPA and a federal court), not those of the city. (*ECO*, 529 F.3d at 528.) As such, the court found it would not be relying solely on the city's assurances that it will not "return to [its] old ways." (*Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).)

Under such circumstances, the *ECO* court found *Carr's* stringent test for "voluntary" mootness to be inappropriate. (*Id.*) Instead, the Court found ECO's claims for relief moot unless ECO (the citizen suit plaintiff) proved that a realistic prospect existed that the violations alleged in its complaint will continue notwithstanding the consent decree. (*Id.* (citing *Comfort Lake*, 138 F.3d at 355; *Atl. States Leg. Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 128 (2d Cir. 1991)).) The Ninth Circuit has also held that citizen suit plaintiffs' CWA claims for civil penalties and declaratory and injunctive relief were moot where alleged violations were not reasonably expected to recur due to the issuance of an NPDES permit. (*Naples*, 158 F.4th at 1061.)

This standard for determining whether any portion of a CWA citizen suit has been mooted by a subsequent government action respects Congress's intent that citizen suits were "meant to supplement rather than to supplant governmental action." (*Gwaltney*, 484 U.S. at 60.) The primary function of a citizen suit is to spur *agency* enforcement of law. (*See Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988) [such suits help "ensure that the agencies fulfill their duties under the CWA responsibly"].) That is why the Supreme Court has noted that "citizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'" (*Gwaltney*, 484 U.S. at 60 (quoting S. Rep. No. 92-414, at 64 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3730).) "Enforcement" need not be a penalty action or injunctive relief but

could also be through a compliance order or permit modification specifying the manner of compliance. (*See accord id.* at 61 [discussing enforcement discretion where agency did not assess penalties but required corrective actions instead]; ECF 409 at 25:21-26:3.) Courts must be cautious not to improperly "cede primary enforcement authority under the CWA to citizens" instead of the agency tasked with primary enforcement, in contravention of congressional intent. (*ECO*, 529 F.3d at 528; *Greater Yellowstone Coal. v. Larson*, 641 F.Supp.2d 1120, 1135 (D. Idaho 2009) [recognizing agency with authority over state water quality standards and deferring to that agency].)

The appeals court in *ECO* found that, for the CWA violations alleged in ECO's citizen suit, ECO had not pointed to specific facts that would support that the city will continue those violations. (*ECO*, 529 F.3d at 529 (citing *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)).)

In this case, for Provision B.2, the 2022 Permit and this Court made it clear that the Cities were deemed in compliance. (ECF 395-2 at 11 [Provision C.1]; FFCL 41:16-17.) And Baykeeper provided no evidence that the Cities violated Provision B.2 under the 2022 Permit. (FFCL 41:9 ["[T]he Cities have complied with the requirements of C.14.a."].) Under Ninth Circuit precedent, "'A request for injunctive relief remains live' only when a 'present harm' is left to enjoin; '[p]ast exposure to illegal conduct' is insufficient." (*Naples*, 158 F.4th at 1060 (brackets in original) (quoting *Bayer v. Neiman Marcus Grp., Inc.* 861 F.3d 853, 864 (9th Cir. 2017)).) Thus, citizens groups like Baykeeper cannot seek injunctive relief for wholly past (pre-2022 Permit) violations. (*Id.* (citing *Gwaltney*, 484 U.S. at 59 ["[T]he harm sought to be addressed by the citizen suit lies in the present or the future, not in the past."].)

Furthermore, Baykeeper cannot at this point prove that any future permit would not continue to deem the Cities in compliance, particularly where the alternative path to compliance has been included in several consecutive permits. (*See, e.g.*, ECF 395-1 at 9; ECF 395-2 at 11.) Baykeeper even wants its requested injunctive relief for Provision B.2 to be substantially delayed, and "<u>to start at the third year after entry of judgment</u>" (ECF 420 at 11:27-28, n.1 (emphasis added)), which will likely be after the new 2027 permit has been issued and is effective.

Because no ongoing violations of Provision B.2 exist or are likely to recur, Baykeeper's

claims for injunctive relief for that provision should be denied or deemed moot. Thus far, the Court has not found any part of the case moot (FFCL 32:8-23), even when only finding *historic* violations of Provision B.2 under the 2015 Permit. (FFCL 41:18-19 ["Cities are liable … for violations of Limitation B.2 during the period from January 17, 2019 to June 30, 2022 (the day before the 2022 Permit went into effect)."].) As a result, Baykeeper now seeks injunctive relief related to Provision B.2 despite those claims becoming moot upon the new 2022 Permit's issuance.

Even if the Provision B.2 claims were somehow not moot, a district court is not bound to order the immediate cessation of all violations. (*ECO*, 529 F.3d at 530.) Traditional equitable principles control the decision to enter an injunction, under which the court has broad discretion to balance the interests of the parties. (*Id.* (citing 11A Charles Alan Wright et al., *Federal Practice and Procedure* §2942 (2d ed. 1990)).) District courts can even deny injunctive relief altogether. (*See id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314-20 (1982)).)

Even if some form of injunctive relief could be ordered, a district court can deny a request for *immediate* relief if the more practical solution allowed a cessation of violations over time. (*Id.* (citing *Rsrv. Mining Co. v. EPA*, 514 F.2d 492, 537-40 (8th Cir. 1975); *N.Y. Coastal Fishermen's Ass'n v. N.Y.C. Dep't of Sanitation*, 772 F.Supp. 162, 169-70 (S.D.N.Y. 1991)).) That solution, seen in 2015 and 2022 Permits at issue, and in every TMDL adopted by the Regional Board for FIB where the waterways were formally declared to be impaired based on adequate data (something absent here), sets forth long-term best management practices (BMPs) that move the waterways towards compliance. (ECF 409 at 27:18-28:20; ECF 395-2 at 186-202.)

Courts have also noted the practical difficulty of enforcing an immediate cessation of violations that occur, in large part, due to rainfall over cities. (*ECO*, 529 F.3d at 530.) Thus, in *ECO*, the court considered the "realistic prospect" test as whether violations will "continue" in the sense that the violations will not be cured even after the remedial plan imposed by the consent decree has been fully implemented in accordance with reasonable timetables. (*Id.*)

Here, the 2022 Permit required specific programs that were injunctive in nature. Because Baykeeper is not *entitled* to any particular form of injunctive relief under the CWA – and, therefore, was not guaranteed to achieve any other form of relief in its citizen suit other than that imposed

under the 2022 Permit – its claims for injunctive relief related to Provision B.2 should be deemed moot and dismissed. (*Id.*) No injunctive relief for Baykeeper's Provision B.2 claims are warranted.

### 2. No Water Quality Component Exists in Provision A.1's "Effective Prohibition."

The Permits' plain language only requires a *discharge prohibition*, not compliance with water quality standards. Discharge Prohibition A.1 of the 2015 and 2022 Permits reads as follows:

> The Permittees shall, within their respective jurisdictions, effectively prohibit the discharge of non-stormwater (materials other than stormwater[6]) into storm drain systems and watercourses. NPDES-permitted discharges are exempt from this prohibition…. (ECF 395-1 at 8; ECF 395-2 at 9.) [7]

The 2015 Permit explained that non-stormwater discharges (NSWDs), also known as "illicit discharges" (40 C.F.R. §122.26(b)(2)), are not authorized, unless approved under a separate NPDES permit or exempted or conditionally exempted in Provision C.15. (Permit, Ex. 1, ECF 395-1 at 8, 216.) The Fact Sheet, which is incorporated into the 2015 Permit (*id.* at 4, ¶1), states:

> Every Permittee must have the ability to effectively prohibit non-stormwater discharges to the MS4 by actively detecting and eliminating illicit discharges and disposal into its MS4. Illicit discharges to the storm drain system can be detected in several ways. Permittee staff can detect discharges during their course of other tasks, and business owners and other aware citizens can observe and report suspect discharges. The Permittee must have a direct means for these reports of suspected polluted discharges to the MS4 to be received, responded to in a timely manner, and to receive adequate documentation, tracking, and response through problem resolution. (*Id.* at 216.)

The 2022 Permit did not require that only storm water and no NSWDs *ever* enter storm drains, but instead required "consistent and timely response to illicit discharges and connections to the MS4." (*Id.* at 217.) "Each Permittee must have a means to adequately track the suspected polluted discharges from reporting through problem resolution." (*Id.*) Moreover, before a violation of Provision A.1 can be determined, one must first determine whether any NSWDs into the storm sewer system are NPDES-permitted or exempt, because if permitted, exempt, or conditionally

---

[6] "Storm water" is defined under CWA regulations as "storm water runoff, snow melt runoff, <u>and surface runoff and drainage</u>." (40 C.F.R. §122.26(b)(13) (emphasis added).)

[7] The Court's FFCL did not contain the entirety of Discharge Prohibition A.1 and did not consider that any NSWDs might be separately permitted or exempt under Provision C.15. (FFCL 2:21-23.)

exempt, then such NSWDs may be authorized by the Cities' Permit. (*Id.* at 291.) The 2022 Permit's Fact Sheet also expressly recognized that the Provision C.14.a enhanced bacteria controls "also implement the prohibition on non-stormwater discharges." (ECF 395-2 at 343.) That Fact Sheet is incorporated as part of the Permit. (*Id.* at 4, ¶1.)

Notwithstanding this language, and the public hearing transcript for the revised 2022 Permit, the Court found that compliance with Provision A.1 requires a *two-part* test. (FFCL 36:1-6.) The Court held the "second component of 'effectively prohibit' requires the Cities to at least come close to avoiding water quality violations." (*Id.*) The Court found Provision A.1 violations, not because of a lack of city ordinances, programs, or proper enforcement, but due to *water quality* outcomes. (*Id.* at 36:13-16 ["The problem is that those programs have been far from successful. In fact, they are not even close since bacterial concentrations in both outfalls and receiving waters have been consistently and significantly elevated above water quality objectives."].)

This ruling conflates a discharge prohibition with an RWL in a way not derived from the plain language of the applicable permits. In fact, the 2022 Permit states that "MS4 permits must include a *technology-based* standard of effectively prohibiting non-storm water discharges through the MS4" (ECF 395-2 at 317 n.83 (emphasis added)), clearly segregating this requirement from *water quality-based* standards. (*Compare* 40 C.F.R. §122.44(a)(1) and (d)(1).) In addition, the Cities are deemed in compliance with the permit's water quality-related requirements through Provisions C.1 and C.14.a, "which prescribe[s] requirements and schedules for Permittees identified therein to manage their discharges that may cause or contribute to violations of water quality standards (WQS) for … bacteria." (ECF 395-2 at 11 (emphasis added).)

The Permit also demonstrates that NSWDs can be allowed even when they could significantly impact water quality. By way of example, the 2022 Permit states: "For instance, firefighting foam and water discharges are [NSWDs] that can have significant impacts on water quality. The requirements to control these discharges, which include the development and implementation of BMPs to prevent firefighting foam and water from entering storm drains, implement the prohibition on [NSWDs]." (*Id.* at 343 (emphasis added).) Thus, such NSWDs are allowed if BMPs, like those prescribed in Provision C.14.a for FIB, are implemented. For these

reasons, there should be no enforceable tie to water quality standards that would justify either liability or injunctive relief for Provision A.1.

### 3. Critique of Baykeeper's Proposed Injunctive Terms

#### a. Source Identification and Elimination with Special Studies

Baykeeper wants the Cities to "conduct 'Special Studies' for every MS4 catchment discharging to Stevens Creek and Calabazas Creek."[8] (ECF 420 at 11:18-19.) They ask for these "Special Studies" to be "modeled on the Cities [sic] existing work described in their Mid-Permit Interpretive Report." (*Id.* at 11:19-20.) As discussed below, an injunction is not needed as that Report demonstrates that the Cities are already doing this work, which goes beyond the minimum requirements set forth in Provision C.14.a, applicable to the Cities. (ECF 395-2 at 184-185.)

As laid out in the Mid-Permit Interpretive Report (ECF 396-2), the Cities have already largely completed the first through third steps laid out by Baykeeper. (ECF 420 at 12:1-12.) Sunnyvale mapped catchments and identified 10 outfalls into Stevens Creek, and 27 outfalls into Calabazas Creek. Mountain View did the same and identified 35 outfalls into Stevens Creek. The 2022 Permit required scans of these outfalls. (*See* ECF 395-2 at 184 ["(2)(a) Sampling of all MS4 outfalls with flow during three dry weather creek walks …."]; ECF 396-2 at 14-18.)

Most of the 72 relevant outfalls were found to be dry. (See ECF 396-2 at 15-17.) For the Sunnyvale outfalls into Calabazas Creek, 11 of the 27 outfalls (41%) were consistently dry during the creek walks, 3 were partially dry or had stagnant water, 7 were not located or were inaccessible, and just 6 had enough flow to be sampled. (*Id.* at 15.) Of the 6 sampled, one (1) outfall [FL-415] became dry before the last sampling event in spring 2023, potentially indicating that the City's programs worked. (*Id.*) So just 5 of the 27 Calabazas outfalls (18.5%) had flows to sample. (*Id.*)

For Stevens Creek, Mountain View has 35 outfalls, 21 of which (61%) were consistently dry, one [B5-8001] did not have enough to sample, and the other 12 were sampled, with one [H5-199] then turning dry, again potentially indicating the success of the City's programs. (*Id.* at 16-17.) Sunnyvale has 10 outfalls to Stevens Creek, 6 of which (60%) were consistently dry, 3 were

---

[8] It should be noted that catchments do not "discharge," outfalls do. (33 U.S.C. §1362(12), (14).)

not located or did not have enough water to sample, and one (10%) had enough flow to sample [SN-502]. (*Id.* at 17.) Thus, of the total of 72 outfall pipes identified by the Cities that can discharge to these two creeks, only 17 (24%) were active enough to warrant sampling. (*Id.* at 15-17.) For the outfalls that had flows and were sampled, the Cities performed Special Studies on the ones with the highest results. (*Id.* at 21, ¶2.5; 28-29; 39-53.) This work is ongoing. (*Id.* at 66-69.)

Baykeeper now asks for a similar program, modeled on the permit's existing requirements and the Cities' resultant work, just on a faster timeline of "no later than three (3) years after entry of Judgment." (ECF 420 at 13:3-4.) However, besides the unreasonable timeframe, many issues arise with Baykeeper's request. First, Baykeeper presumes that sources will be able to be identified and remediated. As expert Brandon Steets testified at trial, the only way to address NSWDs is to do what the Cities are doing, try to locate and remediate dry weather sources (assuming not an NPDES-permitted or exempt discharge (TT 1439:11-22 [Steets]; ECF 395-2 at 9, 203-214)). But he also testified that finding a source can be difficult if not impossible. (TT 1440:10-12 [Steets].) He also stated that even if one outfall is remediated, a new source can pop up anywhere any time, just like Whac-a-mole. (*Id.* at 1440:7-9; *see also id.* at 1636:9-13, 1667:12-24.) Thus, the location/source identification/remediation process is truly never-ending and cannot be deemed "complete" in three years, or in 20 years, as new issues can and will always arise.

Baykeeper also wants "[f]ollow-up confirmation" using HF183, but no enforceable standard exists for HF183. (FFCL 21:11; TT 1295:6-10 [Lichten].)Therefore, HF183 should not be used for any regulatory or injunctive relief purpose.[9] Baykeeper also wants sanitary sewers to be repaired

---

[9] Baykeeper suggests that an injunction should eliminate discharges containing HF183 above 525 gene copies (gc)/100 ml. (ECF 420 at 10:16-17.) Going further, Baykeeper states that "establishing this HF183 standard" is appropriate to ensure that the Cities have effectively prohibited NSWDs. (*Id.* at 21-22.) Freshwater FIB standards already exist. (*See* ECF 395-5 [Ex. 5 (Bacteria Provisions)]; ECF 395-3 [Ex. 3 (SF Basin Plan Table 3-1)].) A new HF183 limit should not be incorporated as a compliance standard into any injunctive relief that might be granted as such standards must be set by states or EPA. (33 U.S.C. §1313(b), (c).)

on a tight schedule even though "the Court found that exfiltration is not a significant source of bacterial pollution." (FFCL 43:12.) These two requirements should be removed if the Court considers granting any relief.

The three-year timeline for this part of the injunction ignores the realities of municipal resources. Each City has a budget that must plan for any new programs. (TT 615:16-23, 799:8-10, 815:10-15, 1032:9-14; ECF 406-3; ECF 406-1.) Funding for a larger, expedited program must come from the general fund so monies would need to be taken from other vital public services (TT 1527:23-1528:16 [Steets]), again to address an issue with no evidence of actual injuries. (*Id.* at 1528:10-16 ["[T]hey found that the amount of illness reduction in an area that gets really high recreational use, wintertime surfing beaches of San Diego County - which is very different than Stevens Creek and Calabazas Creek, right, where we've talked about zero exposure, zero observed exposure according to the Cities' reports – and they found that there was little to no illness reduction benefit from spending that much money."]). Baykeeper seeks to elevate technical violations above everything else the City does, ignoring other actual risks to life and public safety (fires, murders).

Here, the proposed injunctive relief is not needed as the Cities have already created "(a) an inventory of all MS4 catchments discharging to Stevens Creek and Calabazas Creek; (b) a schedule for catchment mapping, representative sampling, and each subsequent step of the Special Studies; and (c) the sampling protocols, analytical methods, and reporting laboratory(ies) to be used." (ECF 420 at 13:5-9; ECF 396-2 at 39-53.) This program is ongoing (ECF 396-2 at 66-69) and the new permit will likely continue to impose or add additional requirements for the next term to ensure reasonable additional steps are taken to address dry weather discharges and FIB.

**b. Dry Weather Discharge Elimination**

Although set out as a different program, this task mirrors much of the first task related to *Source Identification and Elimination with Continued Special Studies*. Both require identification of outfalls where non-stormwater dry weather discharges are occurring. (*Compare* ECF 420 at 12:1-7, *with* 13:22-24.) However, while the first task was confined to "every catchment discharging to Stevens Creek and Calabazas Creek" (*id.* at 11:18-19), the second task is far broader, applying to "every MS4 outfall" (*id.* at 13:23). This expansion assumes that FIB is an issue citywide, which

has not been proven, is beyond this case's scope, and should be rejected.

In addition, task two contains a "similar three (3) years of entry of judgment" deadline, despite the much larger ask of citywide work. (*Compare* ECF 420 at 12:19-23, *with* 14:1-4.) This task also requires a similar confirmation step (*id.* at 13:3-4, 13:25) and adds an additional Annual Report requirement (*id.* at 14:5-7), which duplicates Regional Board annual reporting requirements, and unnecessarily increases both cost and workload for the Cities. (ECF 395-2 at 180, 185, 242.) This Court should not endorse the requested citywide expansion and, if inclined to adopt some form of injunctive relief, any relief should apply only to dry weather and only to Stevens Creek and Calabazas Creek, since dry weather is the focus of the NSWD prohibition. (TT 1492:16-20, 1468:13-19, 1522:9-23, 1529:17-19 [Steets opining that source control won't meet standards in wet weather and no protocol exists for wet weather source control].)

**c. Comprehensive Plan to Reduce Bacteria in Stormwater**

This proposed task would require the Cities to create a plan to ensure that their "stormwater discharges to Stevens Creek and Calabazas Creek will not cause or contribute to exceedances of applicable *E. Coli* WQS in those waters." (ECF 420 at 14:19-21.) Again, Baykeeper did not demonstrate ongoing Provision B.2 permit violations after the effective date of the 2022 Permit, and is therefore not entitled to injunctive relief related to alleged "cause and contribute" violations because the Cities are deemed in compliance through Provision C.1. (FFCL 40-41.)

Moreover, this task will not begin until "no more than three (3) years after entry of Judgment." (ECF 420 at 14:17-18.) In that timeframe, the new MS4 permit will be issued, which will either remove the RWLs deemed unlawful under *CCSF* (604 U.S. at 355), or likely include some form of alternative compliance. Either way, Baykeeper's proposal would not be needed.

Baykeeper also wants the Cities to do a modeling exercise called a Reasonable Assurance Analysis (RAA) for FIB (*see* ECF 420 at 14:22-15:17). The 2022 Permit clearly states that while models may be helpful for some pollutants, like PCBs or mercury (ECF 395-2 at 164 [PCBs], 231 [mercury]), the Regional Board explicitly rejected such an approach for bacteria and determined:

> It is not possible to model sources and loading of bacteria in MS4s using watershed pollutant loading models due to the episodic and variable nature of bacteria sources. Some quantitative analysis of loading may be possible through monitoring; however,

> since bacteria discharge volumes are highly variable both spatially and temporally and difficult to measure, the analysis would inevitably involve a great deal of uncertainty and be unreliable for purposes of quantifying loads from drainage areas.

(*Id.* at 556; *id.* at 558, 561 ["impossibilities or limitations of modeling or conducting quantitative analysis for bacteria discharges"].) The Court should not impose relief previously requested by Baykeeper, and expressly rejected by the Regional Board. (ECF 395-2; ECF 409 at 27-32.)

Moreover, even where RAAs have been performed, the calculations were based on volumetric or *mass* reductions, which means that sampled *concentrations* could remain above the standards. (TT 1525:1-1527:9, 1526:8-10 [Steets: … "concentration is unchanged. And I have already said that every urban land use has concentrations above the FIB standard."].)

Because no injunctive relief is warranted related to Provision B.2 because of no ongoing non-compliance, and because a modeling exercise is not precise enough for FIB to be of value (ECF 395-2 at 556, 558), the Court should deny Baykeeper's request for this task. Baykeeper even acknowledges that the 2022 Permit has a requirement that "the Cities shall submit a plan for additional actions to attain the [RWLs]" and provides guidance on what that plan should include (ECF 420 at 17:12-22), further making this task superfluous to existing permit requirements.

**d. Ongoing Monitoring to Confirm Compliance**

For the reasons provided above, a separate monitoring program is not needed to "demonstrate meaningful progress and ultimate compliance with Discharge Prohibition A.1, and Receiving Water Limitation B.2." (ECF 420 at 19:5-6.) The Cities are currently in compliance with Provision B.2, finalizing special studies (ECF 396-2 at 66-69), and further water quality sampling is not needed to demonstrate compliance with Provision A.1. The goal of having dry outfalls, like most of the Cities' outfalls in dry weather (ECF 396-2 at 15-17), or ensuring that any discharge comes from a permitted or exempted source, represents a clearer delineation of compliance and would also reduce inputs from these outfalls during wet weather.

**e. Final Compliance Deadline**

If an injunction is issued, the Cities would support an allowance for a motion to terminate, but believe that such a motion should <u>not be limited</u> to situations where the Cities have completed certain requirements, or where data demonstrates compliance with receiving water standards. The

Cities should be able to terminate any injunction if the Cities can demonstrate compliance with the terms of any future permit, if the uses/water quality objectives change, if new studies show illness rates are below the adopted 32/1000 swimmer illness rate (ECF 395-5 at 3, Table 1), or if the creeks are determined not to be WOTUS (as then there would be no enforceable federal standard). Any of these pathways could demonstrate compliance and the Cities should not be constrained in how compliance can be demonstrated.

**f. Reporting Requirements**

For the reasons provided herein, water quality sampling data need not be collected to demonstrate or achieve compliance with Provision A.1. Thus, no need exists to provide monitoring results and separate annual reports to Baykeeper as Annual Reports to the Regional Board have and will contain this information if collected. Should the Court require an injunction, the Cities would be amenable to submitting "Joint Status Reports on a schedule ordered by the Court." (ECF 420 at 20:11-12.) However, the Cities do not believe that such reports are warranted "as soon as an irreconcilable dispute arises" (*id.* at 20:12) because disputes should not arise if the terms are clear.

**4. Twenty Years of Oversight and Compliance Payments Are Unnecessary.**

In addition to the substantial interim attorneys' fees already paid by the Cities (*see* ECF 227 at 6 [ordering payment of interim fees in the amount of $865,170.77]), and the additional fees and costs that will inevitably be sought by Baykeeper post-judgment, Baykeeper requests that each City pay Baykeeper every year "to defray the cost to Baykeeper for monitoring compliance with the Injunction." (ECF 420 at 20:21-22.) Baykeeper cites "Clean Water Act, section 303(d)" for the allegation that "[f]ees and costs for this work are recoverable" (*id*. at 20:25-26), but CWA Section 303(d) relates to impaired waters and TMDLs, not attorneys' fees or oversight monitoring costs. (*See* 33 U.S.C. §1313(d).) Baykeeper also cites *Earth Island Institute v. Southern California Edison Co.*, 92 F.Supp.2d 1060 (S.D. Cal. 2000), as justification for these extra fees and costs, but that case involved oversight and interpretation of a settlement/consent decree, which is not found here.

Assuming injunctive relief is granted, the only way this award would be reasonable and acceptable to the Cities would be if Baykeeper's separate oversight (beyond the Court's oversight) is deemed necessary, and such payments *preclude* Baykeeper from seeking to recover oversight

fees and costs later, even if their estimated amounts are exceeded. (*See accord* ECF 420 at 20:27-28 ["Including this payment in the Injunction will save the Court and the parties' resources by avoiding the need for multiple motions to recover fees and costs at a later date."].)

### C. Any Injunctive Relief Should Be Deferred So That the Regional Board Can Decide What Is Needed for Future Compliance.

Baykeeper acknowledges that remediation work will take at least 20 years for FIB standards to be met in the receiving waters and has asked for a 20-year timeframe for injunctive relief. (*Id.* at 11:12-13 ["Given the potential scale of the work needed, Baykeeper believe [sic] this should be completed within 20 years"], 17:2-3.) The missing piece from Baykeeper's request is the acknowledgement that the Cities are *already on* an injunctive relief pathway set forth in the Cities' C.1 Plan and Provision C.14.a. of the 2022 Permit. It should not be surprising to anyone, and particularly Baykeeper, that compliance has not *YET* been achieved. (*See accord* TT 387:3-5 [Wren opining that bacteria control would take a "decadal-type implementation program"].)

The Court should defer to the Regional Board's imposed measures because of the expertise of that government agency that adopted both the standards to be met and the permit to comply. (*See Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 830-831 (9th Cir. 2002) [abrogated on other grounds by *Monsanto*, 561 U.S. at 157]; *see also* TT 1673:5-11 [the Court discussing deference to Water Boards on technical compliance plans].) In *Idaho Watersheds*, the terms of an injunction to protect land and streams from the effects of too much cattle grazing pending the BLM's compliance with NEPA mirrored the BLM's proposed interim measures to respond to environmental injury, which the court thought represented a "balanced approach." (307 F.3d at 823.) Affirming the lower court, the Ninth Circuit recognized its "considerable deference for factual and technical determinations implicating substantial agency expertise." (*Id.* at 831 (citing *Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998)).) *Idaho Watersheds* concluded that it did not need to conduct an extensive inquiry, involving scientific determinations, to determine what interim measures are necessary to protect the environment "while the [government] conducts studies in order to make the very same scientific determinations." (*Id.*) The district court rejected what it viewed as "drastic" proposals from the Environmental Groups, and was upheld on appeal. (*Id.*)

*Idaho Watersheds* involved interim measures that would be in place only until the EIS was completed, at which point the parties would have "extensive input" into the determination of which measures would be adopted permanently. (*Id.*) The same could be said here. The Regional Board is already in the process of drafting a new NPDES permit that will regulate NSWDs and FIB in the Cities' stormwater discharges. Both the Cities and Baykeeper will have the ability to provide public comments on what the draft permit should or should not require. Instead of creating a 20-year program for judicial and Baykeeper oversight, the Court should defer ruling on the injunctive relief requested until the new permit is adopted as that permit is the proper vehicle for remedial activities to be prescribed, and may resolve any remaining issues without need for separate injunctive relief.

Because NPDES permits are adopted for a five-year period and the last one became effective on July 1, 2022, and expires on June 30, 2027 (ECF 395-2 at 243-244), a draft new permit is expected to be adopted in winter 2026 and be effective in mid-2027. Given that this case has been going on for over six years already, it would not be unreasonable to defer a ruling on the requested injunctive relief until the new permit is adopted to determine if non-compliance could feasibly continue, or if the Cities could be deemed to be compliant at that time.

### D. <u>An Evidentiary Hearing Is Required Prior to Issuing a Permanent Injunction.</u>

Although Baykeeper failed to request one, this Court is required to conduct an evidentiary hearing before issuing an injunction under Federal Rule of Civil Procedure 65 unless (1) the facts were undisputed; or (2) the adverse party(ies) expressly waived its right to an evidentiary hearing. (*Charlton v. Est. of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988).) Here, the facts have been disputed by the Cities since the filing of Baykeeper's complaint, and facts related to the specific feasibility, extent, and cost of Baykeeper's newly proposed injunctive relief package were not explored at trial. In addition, the Cities have not waived any right to an evidentiary hearing to explore the necessity and feasibility of Baykeeper's requested injunctive relief.

## III. CONCLUSION

For the above reasons, the Cities respectfully request that the requested injunctive relief be denied or deferred until after an evidentiary hearing, or preferably until after the adoption of the new MS4 permit applicable to the Cities to determine if any further relief is warranted.

Respectfully submitted,

DATED: June 12, 2026

STOEL RIVES LLP

MELISSA A. THORME
ANDREW D. PEREZ

*Attorneys for Defendants,*

*CITY OF SUNNYVALE and*
*CITY OF MOUNTAIN VIEW*